08-2626-cv
*Gross v. Rell*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: May 20, 2009        Question Certified: October 27, 2009)

Docket No. 08-2626-cv

_____

DANIEL GROSS,
*Plaintiff*,

CAROLYN DEE KING,
*Plaintiff-Appellant*,

—v.—

M. JODI RELL, GOVERNOR, STATE OF CONNECTICUT, IN HER OFFICIAL CAPACITY; MAGGIE EWALD, FORMER ACTING LONG-TERM CARE OMBUDSMAN OF THE CONNECTICUT DEPARTMENT OF SOCIAL SERVICES, IN HER INDIVIDUAL CAPACITY; THOMAS P. BRUNNOCK, PROBATE JUDGE FOR THE DISTRICT OF WATERBURY, IN HIS INDIVIDUAL CAPACITY; KATHLEEN DONOVAN, IN HER INDIVIDUAL CAPACITY; JONATHAN NEWMAN, IN HIS INDIVIDUAL CAPACITY; GROVE MANOR NURSING HOME, INC., IN ITS INDIVIDUAL CAPACITY,[*]
*Defendants-Appellees*.

_____

B e f o r e :

JACOBS, *Chief Judge*, STRAUB AND HALL, *Circuit Judges*.

_____

[*] The Clerk of Court is directed to amend the official caption in this case to conform to the listing of the parties above. James J. Lawlor has been removed, as he was initially a defendant below but all claims against him were withdrawn at the District Court level. *See* J.A. 1 (revised complaint).

Appeal from dismissal of all claims as to all defendants in civil rights lawsuit arising out of the alleged mistreatment of Plaintiff Daniel Gross. An involuntary conservatorship was instituted as to Gross by the Waterbury, Connecticut Probate Court; the conservatorship was ended when a Connecticut Superior Court judge granted Gross's petition for a writ of habeas corpus, finding that the conservatorship should not have been imposed. Gross subsequently sued the Probate Court judge, the conservator, the court-appointed attorney, the nursing home in which he was placed, and various state officials. The U.S. District Court for the District of Connecticut (Vanessa L. Bryant, *Judge*) dismissed the complaint, primarily on the basis of judicial immunity (as to the judge) and quasi-judicial immunity (as to the conservator, attorney, and nursing home). Claims against the state officials were dismissed for procedural reasons.

We affirm the dismissal of claims against the state officials, the tort claims against the nursing home, and the finding of absolute judicial immunity as to the judge. However, Connecticut law on quasi-judicial immunity, which applies to state-law claims, is unclear. Therefore, we certify questions to the Connecticut Supreme Court regarding quasi-judicial immunity.

As to the federal claims: our circuit is bound to apply the federal law of quasi-judicial immunity. However, in this case and on these facts, the factors we must consider directly implicate unsettled questions of state law. Therefore, we certify a question to the Connecticut Supreme Court, asking for its guidance as to those factors. Upon receiving the Connecticut Supreme Court's response, we will decide the federal question.

Affirmed in part, Certified to the Connecticut Supreme Court in part.

_____

SALLY R. ZANGER, Connecticut Legal Rights Project, Inc., Middletown, CT, for *Plaintiff-Appellant*.

GREGORY T. D'AURIA, Associate Attorney General for the State of Connecticut (Richard Blumenthal, Attorney General, Jane R. Rosenberg, Assistant Attorney General, Clare Kindall, Assistant Attorney General, *of counsel*), Hartford, CT, for *Defendants-Appellees M. Jodi Rell, Maggie Ewald, and Thomas P. Brunnock*.

RICHARD A. ROBERTS (Nadine M. Pare, James R. Fiore, *of counsel*), Nuzzo & Roberts L.L.C., Cheshire, CT, for *Defendant-Appellee Kathleen Donovan*.

LOUIS B. BLUMENFELD (Lorinda S. Coon, *of counsel*), Cooney, Scully and Dowling, Hartford, CT, for *Defendant-Appellee Jonathan Newman*.

JEFFREY R. BABBIN, Wiggin and Dana, LLP, New Haven, CT, for *Defendant-Appellee Grove Manor Nursing Home, Inc.*
_____

STRAUB, *Circuit Judge*:

For nearly a year beginning in 2005, Daniel Gross, an octogenarian, had a conservatorship imposed for his estate and person against his will. He was kept in a nursing home for ten months, until a Superior Court judge in Connecticut, citing "a terrible miscarriage of justice," granted his petition for a writ of habeas corpus and ordered him released. This lawsuit stems from that unfortunate series of events.

It is alleged that a probate court judge signed a facially impossible order that did not comply with the law; the court-appointed attorney disregarded Gross's wishes to return to his home in New York; the court-appointed conservator forcibly kept Gross in a nursing home, against medical advice; and a nursing home housed Gross with a violent roommate who attacked him. The complaint further alleges that defendant Maggie Ewald, Connecticut's Long-Term Care Ombudsman at the time, did not act on complaints about Gross's treatment at the nursing home because of concerns about adverse publicity.

These allegations, if true, might make out a case against the defendants. However, Judge Thomas P. Brunnock, Conservator Kathleen Donovan, Attorney Jonathan Newman, and Grove Manor Nursing Home, Inc. ("Grove Manor") have asserted absolute immunity to suit: Brunnock has asserted judicial immunity and the other three have asserted quasi-judicial immunity. The District Court agreed and dismissed all claims against those defendants. (Claims against Governor M. Jodi Rell and Ewald, as well as certain of Gross's statutory and tort claims against Grove Manor, were dismissed for various procedural reasons.)

The federal common law defense of quasi-judicial immunity applies to Gross's federal claims, and the similar but distinct *state* common law defense of quasi-judicial immunity applies to Gross's state law claims. Connecticut state law is unsettled as to quasi-judicial immunity. Therefore, we certify questions to the Connecticut Supreme Court on the state law claims.

On the federal law claims, we apply the multi-factor test for quasi-judicial immunity set forth by the Supreme Court. However, in this case, application of those factors involves unsettled questions of Connecticut state statutory and common law. Therefore, we ask the Connecticut Supreme Court for its guidance as to these factors. Upon receiving its response, we will decide the federal claims.

Quasi-judicial immunity applies only to Donovan, Newman, and Grove Manor. We affirm the grant of judicial immunity as to Brunnock and affirm the dismissal of the other claims.

**BACKGROUND**

In 2005, Daniel Gross, a life-long New York resident, was discharged from a hospital in

New York after treatment for a leg infection.[1]  Shortly thereafter, he went to Waterbury, Connecticut, where his daughter lived, to convalesce.  On August 8, 2005, he was admitted to Waterbury Hospital because of complications from his previous treatment.  Nine days later, on August 17, 2005, Barbara F. Limauro, a hospital employee, filed an application for appointment of conservator in Waterbury Probate Court.  The record does not indicate what prompted Limauro to file this application.

The pertinent statute requires the probate court, as a threshold matter, to give the respondent seven days' notice in any application for an involuntary conservatorship.  CONN. GEN. STAT. ANN. § 45a-649(a).[2]  In addition, the notice must be served on the respondent or, if doing so "would be detrimental to the health or welfare of the respondent," his attorney.  *Id.* § 45a-

---

[1] As an appellate court, we do not engage in fact-finding.  We take all facts and draw all inferences in the light most favorable to appellant, as we must do at the motion to dismiss stage, although we need not give credence to "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

[2] Connecticut's statutory conservatorship scheme was amended in 2007, after the incidents in this case took place.  Unless otherwise specified, this opinion cites to the version of the statute in place at the relevant time.

We are of the opinion that the 2007 revisions do not affect the underlying issues in this case regarding quasi-judicial immunity.  *See, e.g.*, CONN. GEN. STAT. ANN. § 45a-648(a)-(d) (West 2008 pocket part) (outlining various provisions for an involuntary conservatorship as to one who is a non-resident or non-domiciliary); *id.* § 45a-649a (making various provisions for representation of a respondent in an involuntary conservatorship proceeding); *id.* § 45a-650(a) (specifying that probate court must "require clear and convincing evidence that the court has jurisdiction, that the respondent has been given notice . . . , and that the respondent has been advised of the right to retain an attorney").  These changes do not go to the underlying question here, namely, whether conservators, attorneys, and nursing homes may, as a matter of law, enjoy quasi-judicial immunity under federal and state common law.  So far as we can ascertain, the questions we are certifying, regarding immunity generally, are unaffected by this revision.  In any event, we have no reason to conclude that this amendment should apply retroactively, and the parties do not suggest otherwise.

649(a)(1)(A). The statute makes no provision for giving notice to the respondent other than by personal service or service upon his attorney.

On August 25, 2005, Judge Thomas P. Brunnock issued an order of notice of a hearing to be held on September 1, 2005, in connection with Limauro's application. On August 30, 2005, the notice was served on Limauro. However, as the Connecticut Superior Court pointed out in the subsequent habeas proceeding, there was no indication that Gross himself ever received notice of the September 1 proceeding. The parties do not dispute that (1) Gross was entitled to notice of the hearing, (2) he should have been given at least seven days' notice, pursuant to Section 45a-649(a), and (3) the order dated August 25, 2005, specified that Gross should be served by *August 24*.

Also on August 25, 2005, Brunnock appointed Jonathan Newman to represent Gross in the involuntary conservatorship action. Newman interviewed Gross, who told Newman that he opposed the conservatorship. Newman described Gross as alert and intelligent and stated in a report that Gross wanted to live at home and manage his own affairs. Nevertheless, Newman concluded that he could not "find any legal basis in which to object to the appointment of a conservator of Daniel Gross' person and estate." Newman also signed the form "attorney for ward." The relevant statute defines a "ward" as "a person "for whom involuntary representation *is granted*" pursuant to statute. CONN. GEN. STAT. ANN. § 45a-644(h) (emphasis added). At the time Newman signed the form, no such representation had been granted; Gross was not a "ward" but rather a "respondent." *Id.* § 45a-644(f).

A Superior Court judge would later say that Newman's conclusion that there was no legal basis for objecting to the involuntary conservatorship "completely blows my mind," that there

-6-

was "[n]o support for it," and that "it just defies imagination. . . . This was counsel for Mr. Gross and it is obvious to me that he grossly under and misrepresented Mr. Gross at the time." J.A. 115.

The respondent also has a right to attend any hearing on the application. CONN. GEN. STAT. ANN. § 45a-649(b)(2). If he wishes to attend "but is unable to do so because of physical incapacity, the court *shall* schedule the hearing . . . at a place which would facilitate attendance . . . but if not practical, then *the judge shall visit the respondent*" before the hearing, if he is in the state. *Id.* (emphasis added). The next section reiterates that a judge could "hold the hearing on the application at a place within the state other than its usual courtroom if it would facilitate attendance by the respondent." *Id.* § 45a-650(c). The parties do not dispute that (1) Judge Brunnock never visited Gross, (2) the hearing was not held at a location that would facilitate Gross's attendance, and (3) Gross was not personally present at the hearing.

Furthermore, Connecticut law at the time only permitted a conservatorship for those who were residing or domiciled in Connecticut, *id.* § 45a-648(a); Gross was neither a resident nor a domiciliary. It is undisputed that Newman failed to bring this jurisdictional defect to the court's attention. (As will be explained *infra*, it was on the basis of this defect that the Connecticut Superior Court eventually granted Gross's petition for a writ of habeas corpus and held the conservatorship void *ab initio*.)

On September 1, 2005, Brunnock appointed Kathleen Donovan as conservator to manage Gross's person and estate. Connecticut state law provides that the probate court must require a probate bond and, "if it deems it necessary for the protection of the respondent, [it may] require a bond of any conservator" as well. CONN. GEN. STAT. ANN. § 45a-650(g). Donovan never posted

-7-

a bond.

A week or two later, Donovan placed Gross in the "locked ward" of Grove Manor Nursing Home. Gross alleges in his complaint that his roommate was a confessed robber who threatened and assaulted him. Gross also claims that Grove Manor, with the knowledge and consent of Donovan, kept him in a room with the violent roommate after it learned of the assault, which was not reported to the police.

In April of 2006, Gross was on an authorized day visit to Long Island. While there, he experienced chest pains and was admitted to a hospital. According to the complaint, Donovan came to Long Island with an ambulance and insisted that Gross be returned to Connecticut. When the doctor indicated that this was medically unwise, Donovan nonetheless removed Gross from the hospital against his wishes and returned him to the locked ward at Grove Manor.

Gross alleges in his complaint that there was no reason to put him in the locked ward. He further alleges that Ewald, the state ombudsman, and Donovan, the conservator, were aware of these problems but failed to take steps to alleviate them. The parties do not dispute that Donovan obtained from Brunnock *ex parte* orders limiting Gross's contact with family and with counsel; Gross claims that there was no evidence suggesting that such contact was harmful to him. We are very troubled by one such order in particular. According to Gross's complaint, this order restricted Gross's daughter's ability to visit him: the visits were required to be on-premises, only once per day, for no longer than one hour. Strangely, it also prohibits her from bringing "any recording devices (visual and/or audio) into Grove Manor Nursing Home." The restrictive nature of the order, and the prohibition on the use of recording devices, gives credence to Gross's allegation that there was a conspiracy to deprive him of his rights — and potentially, to prevent

-8-

the exposure of such injustices.

On June 9, 2006, Gross filed a petition for a writ of habeas corpus in Connecticut Superior Court. A hearing was held on July 12. Brunnock moved to dismiss, making the (rather remarkable) argument that habeas relief was unnecessary because, if the Probate Court acted without jurisdiction, the conservatorship was void *ab initio* and Gross could leave Grove Manor at any time. The Superior Court granted the writ:

> [O]ut of an absolute caution that somebody else may come in and file [an] appearance in this case, I'm going to grant the writ of habeas corpus[;] I'm going to find in accordance with the statute that he has – is and has been, since September 1, been deprived of his liberty. And at the time of his – of his appointment of the conservator of both his person and his estate, Probate Court lacked the jurisdiction on the basis that he was not a domiciliary and/or a resident of the [S]tate of Connecticut. The conservatorship is terminated as a result of the decision on the habeas corpus and Mr. Gross is free to leave here today.

The court also halted all pending transactions involving Gross's property, saying "that nothing [is to] be done with the sale of [Gross's] house in New York," and that "any previous orders of the Probate Court with reference to that real property in New York are also terminated, so there is nothing in New York." The Superior Court said there had been "a terrible miscarriage of justice."

Upon returning to New York, Gross found that his house had been, in his words, "ransacked." The complaint alleges that a chandelier and some furniture were missing. Gross lived independently in his home from the time of his release at least until the time of the complaint, and apparently until the time of his death in 2007.

In 2007, plaintiff brought the complaint and the District Court dismissed it as to all

defendants.  The District Court found that Brunnock was entitled to judicial immunity.  The court went on to reason that the conservator, attorney, and nursing home were entitled to immunity because they were serving the judicial process.  However, the District Court reasoned that the nursing home was *not* entitled to derivative, quasi-judicial immunity for discretionary acts that were not performed specifically for the purpose of complying with a Probate Court order.  Thus, the nursing home's decision to leave Gross in a room with his roommate for several days, after his roommate attacked him, was held to be discretionary and not protected by quasi-judicial immunity.  This left statutory[3] and tort claims against the nursing home.  The District Court dismissed the statutory claims on the basis of waiver, leaving only the tort claims, which consisted of claims for intentional and negligent infliction of emotional distress.

The District Court also dismissed all claims against the governor and most claims against the ombudsman, essentially on failure to prosecute or waiver grounds.  However, it initially let stand the claims against the ombudsman for failure to investigate complaints about Gross's detention in the nursing home.  Thus, there were two sets of claims remaining: intentional and negligent infliction of emotional distress against the nursing home regarding the violent roommate and intentional infliction of emotional distress against the ombudsman for failure to investigate.[4]

Then, at the end of a telephone conference about discovery and the course of the lawsuit,

---

[3] The statutory claims against the nursing home alleged violations of the Omnibus Budget Reconciliation Act of 1989, 42 U.S.C. § 1396r, and the Patients' Bill of Rights, CONN. GEN. STAT. ANN. § 19a-550.

[4] The negligent infliction of emotional distress claim against the ombudsman was dismissed because Connecticut state officials have immunity for negligent acts. CONN. GEN. STAT. ANN. § 4-165.

-10-

the District Court announced that it did not think those remaining claims would exceed $75,000 and said it would dismiss the case. Counsel did not object to this dismissal, and those claims were dismissed without prejudice. Once these were dismissed, there were no remaining claims. Gross's timely appeal followed.

**DISCUSSION**

The main issue in this case pertains to judicial and quasi-judicial immunity. For the reasons described below, Brunnock is entitled to judicial immunity. However, we certify to the Connecticut Supreme Court certain questions relating to quasi-judicial immunity as to the conservator, the attorney, and the nursing home. We affirm the District Court's dismissal of all other claims as to Rell and Ewald and the statutory claims against the nursing home.[5] We note at the outset that, although we affirm the District Court's dismissal of many claims, we do not condone the actions of the defendants.

**I.      An Overview of Judicial and Quasi-Judicial Immunity**

**A.      In General**

In this case, there are several intersecting issues. The first question is whether defendants Brunnock, Donovan, Newman, and Grove Manor may assert judicial or quasi-judicial immunity as a defense. The second question, assuming immunity applies, pertains to the *scope* of that

---

[5] We note that the intentional infliction of emotional distress claim against Ewald and the nursing home, and the negligent infliction of emotional distress claim against the nursing home, were dismissed without prejudice for want of jurisdictional minimum. These claims may be reasserted if quasi-judicial immunity does not apply and the claims as to Donovan, Newman, and Grove Manor are reinstated. They may also be reasserted in a separate action in any event.

Additionally, as noted earlier, James J. Lawlor (Connecticut's Probate Court Administrator) is listed in the caption; however, the revised complaint asserts no claims against him.

-11-

immunity. Finally, as to each of the defendants and claims pled in this case, there is the question of whether federal or state law on immunity governs. The defendants' briefs — and, to be sure, some of the cases in this area — either blur, or do not recognize, these distinctions.

Gross is asserting federal and state law claims against state officials. The doctrine of judicial and quasi-judicial immunity is, in the main, a creation of the U.S. Supreme Court with regard to federal claims and thus a federal law doctrine. The cases support employing the federal defense of quasi-judicial immunity as against federal claims. However, Gross had also pled state law claims against state defendants. Connecticut has adopted tests for judicial and quasi-judicial immunity that are nearly identical to the federal law tests. However, the state law doctrine is conceptually distinct from the federal law doctrine.

With regard to the state law claims, we recognize the uncertainty regarding the state law doctrine of quasi-judicial immunity and certify questions to the Connecticut Supreme Court as to the availability of immunity. Normally, we would apply federal law to the federal claims and simply decide them. However, in this case, the federal test involves applying the so-called *Cleavinger* factors. *See Cleavinger v. Saxner*, 474 U.S. 193 (1985). These factors — which inquire into the nature of the actor in the judicial system, the existence of safeguards, the role of precedent, and so on — implicate unsettled questions of state law. Therefore, we ask the Connecticut Supreme Court for its guidance as to those factors. After the court responds, we will make the ultimate determination, as a matter of federal law, of whether immunity applies.

**B.      Applicable Legal Standards**

Defendant Brunnock asserts the defense of judicial immunity, while defendants Donovan, Newman, and Grove Manor assert the defense of quasi-judicial immunity. The first, threshold

question is whether these defendants may assert these defenses at all. The cases indicate that the *federal* common law on judicial immunities applies even to *state* officials when they are sued in federal court on federal claims. *See Pierson v. Ray*, 386 U.S. 547 (1967) (§ 1983 action against local police officers and judges); *Tucker v. Outwater*, 118 F.3d 930 (2d Cir), *cert. denied*, 522 U.S. 997 (1997) (§ 1983 action against New York town justice). We apply this federal test even when the substantive inquiry involves state law. *See Tucker*, 118 F.3d at 932 (noting that whether the judge "acted in the clear absence of all jurisdiction" turned on New York law regarding the scope of the judge's jurisdiction); *Huminski v. Corsones*, 396 F.3d 53, 76 (2d Cir. 2005) (noting, in a § 1983 action against state judges, that courts "look to state law to determine whether [the judges] acted within their jurisdiction and . . . as to whether they acted . . . in their judicial capacities," and then applying the federal law test for judicial immunity). As we describe below, we may apply settled federal law to dispose of the question of judicial immunity as to Brunnock with regard to federal claims.

In this case, federal jurisdiction over the state-law claims against Brunnock were based on diversity jurisdiction. Diversity of citizenship cases, though brought pursuant to federal subject matter jurisdiction, are decided on the basis of *state* substantive law. *Krauss v. Manhattan Life Ins. Co. of N.Y.*, 643 F.2d 98, 100 (2d Cir. 1981). Therefore, as to those claims, we look to Connecticut law to determine if judges enjoy immunity and, if so, under what circumstances. Connecticut has a doctrine of judicial immunity, which is, in all respects relevant here, identical to the federal test. *See Shay v. Rossi*, 253 Conn. 134, 170 (2000) (citing *Stump v. Sparkman*, 435 U.S. 349, 364 (1978)), *overruled on other grounds*, *Miller v. Egan*, 265 Conn. 301 (2003);

*Leseberg v. O'Grady*, 115 Conn. App. 18, 22 (2009) (citing *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991)). Therefore, because Connecticut law is clear as to judicial immunity, we may decide that question as well.

As to the remaining defendants, the issue is closer. Donovan, Newman, and Grove Manor are asserting not judicial immunity, but *quasi-judicial* immunity. In this context, the U.S. Supreme Court has set forth a "functional" test that is binding on this court on matters of federal law. *See Cleavinger*, 474 U.S. at 201-02 (explaining that quasi-judicial immunity is determined by a functional approach, in light of several enumerated factors); *see also Butz v. Economou*, 438 U.S. 478, 511-12 (1978) (describing the functional approach). We clarify now that the federal law on quasi-judicial immunity applies to state officials sued in federal court on federal claims. Courts have so held in the context of judicial immunity. *Cf. Pierson*, 386 U.S. 547; *Tucker*, 118 F.3d 930. Judicial and quasi-judicial immunity are both absolute immunities. *See Mitchell v. Forsyth*, 472 U.S. 511, 521 (1985) (noting that both are absolute immunities); *but see Kalina v. Fletcher*, 522 U.S. 118, 132 (1997) (Scalia, J., concurring) (noting that, historically, quasi-judicial immunity "was more akin to what we now call 'qualified,' rather than absolute, immunity"). We discern no reason to treat them differently with regard to choice of law questions. Thus, federal law on quasi-judicial immunity, and specifically, the functional approach specified in *Cleavinger*, applies to Gross's federal claims against Donovan, Newman, and Grove Manor.

However, again because our jurisdiction over state claims is grounded in diversity of citizenship, state substantive law applies to Gross's state-law claims against Donovan and

Newman.[6] *See, e.g.*, *Bonime v. Avaya, Inc.*, 547 F.3d 497, 501 n.4 (2d Cir. 2008). Once again, we look to Connecticut law to determine if conservators and court-appointed attorneys for conservatees are entitled to absolute quasi-judicial immunity, and, if so, under what circumstances. Connecticut law, like federal law, employs a "functional" approach to quasi-judicial immunity. *See Carrubba v. Moskowitz*, 274 Conn. 533, 542-43 (2005) (employing a test derived from *Butz*, 438 U.S. at 513-17). *Carrubba* involved state claims (emotional distress and malpractice) against a court-appointed counsel for a minor child. *Id.* at 536. The Connecticut Supreme Court noted that *Butz* involved claims brought under federal law pursuant to § 1983. *See id.* at 542. However, the *Carrubba* court did not suggest that the test should be any different when state law claims were at issue, as they were in that case. *See id.* (stating that it was adopting the Supreme Court's test for quasi-judicial immunity to determine whether attorneys appointed as counsel for minor children "should be accorded absolute immunity under [Connecticut] state common law").

Thus, in the normal course, to determine whether quasi-judicial immunity extends to Donovan and Newman, we would simply apply *Cleavinger* to test the validity of the quasi-judicial immunity defense to the federal law claims and the similar *Carrubba* functional analysis in connection with the state law claims. However, in this particular case and on these facts, both analyses intersect unsettled questions of state law. First, as to the quasi-judicial immunity

---

[6] As we explain *infra*, all state law claims against the nursing home have been dismissed. Therefore, there is no need to decide whether a nursing home may raise the defense of quasi-judicial immunity under state law. We will, of course, have to decide the question as a matter of federal law with respect to the federal claims.

defense regarding state law claims: no Connecticut case squarely addresses whether conservators and court-appointed attorneys for conservatees may enjoy quasi-judicial immunity. The most analogous case pertains only to attorneys appointed as counsel for minor children, *see Carrubba*, 274 Conn. 533, and it is not sufficiently similar to this case for us to determine with confidence what state law on this point is. Therefore, we certify questions to the Connecticut Supreme Court so that it may decide whether conservators and court-appointed attorneys for conservatees may assert quasi-judicial immunity *as to state claims*, and the scope of any such immunity, as a matter of state law. The state court's pronouncement as to those questions will be final.

As to the quasi-judicial immunity defense to the federal law claims, *Cleavinger* instructs courts to analyze various factors, described *infra*, in determining whether quasi-judicial immunity applies. *Cleavinger*, 474 U.S. at 201-02. In this case, these factors intersect with the nature and function of the Connecticut probate court system. Although we *could* analyze those factors and simply decide the immunity question as a matter of federal law, we deem it the more prudent course to allow the Connecticut Supreme Court to speak to the issue first.

In deciding the federal immunity question, we would apply the *Cleavinger* factors, which we detail *infra*. We respectfully request that the Connecticut Supreme Court discuss these factors in light of the role played by conservators, attorneys, and nursing homes. We will decide, after receiving the Connecticut Supreme Court's guidance, the federal law immunity questions.

In so doing, we do not intend to suggest that judicial immunity always turns on state law. Indeed, the common law doctrine predates even our government. *See Floyd v. Barker*, 77 Eng. Rep. 1305 (Star Chamber 1607). The U.S. Supreme Court has recognized judicial immunity for

over one hundred years, *see Bradley v. Fisher*, 80 U.S. (13 Wall.) 335 (1871), as have federal courts around the country, *see, e.g.*, *Cok v. Consentino*, 876 F.2d 1 (1st Cir. 1989), including our own, *see Tucker*, 118 F.3d 930, when addressing federal civil rights claims. Nevertheless, application of *Cleavinger* in this case directly implicates the role and function of conservators, attorneys, and nursing homes in the Connecticut probate court system and Connecticut public policy, matters that the Connecticut Supreme Court is better equipped to speak to.

If, based on the Connecticut Supreme Court's guidance as to the *Cleavinger* factors, we conclude that the quasi-judicial immunity defense is not available to Donovan, Newman, or Grove Manor, as a matter of federal law, then we need not decide the precise outer bounds of immunity. However, if we ultimately conclude that the immunity defense *is* available to any of the defendants under federal law, we will have to determine the circumstances under which immunity is defeated. Even judicial immunity, which provides judges with very broad protection, may be overcome if the judge acts in the clear absence of all jurisdiction or if he is not acting in his judicial capacity. *See, e.g.*, *Tucker*, 118 F.3d at 933 (citing cases). It may be the case that *quasi-judicial* immunity may similarly be overcome: for example, if the plaintiff alleges that the actions a defendant took were discretionary (as opposed to in strict compliance with court orders), undertaken in bad faith, intentional torts, etc. No case in our Circuit spells out the circumstances under which quasi-judicial immunity may be surmounted. If such immunity exists in this case, we will undertake to decide this second-order question. If it does not, then Gross's lawsuit may proceed in the normal course.

The nature of this "second step" can be illustrated with an example from Donovan's brief.

Donovan argues that the actions she took — selling Gross's property, maintaining a bank account with him, changing the locks on his house, etc. — were proper and within the scope of the duties that a conservator typically carries out. However, these arguments do not go to whether a conservator has immunity (step one). They go to whether Gross's complaint, *assuming there is immunity*, alleges sufficient facts to overcome it. It may, or it may not (we do not decide that question now), but it is a distinct question from whether quasi-judicial immunity even extends to these kinds of defendants.

Of course, it should go without saying that Donovan (or any defendant) cannot, at this stage, argue that certain actions (such as placing Gross in the locked ward of the nursing home, restricting his access to his children, and forcibly returning him to Grove Manor from a New York hospital) were for his own protection. At this stage, we must construe all facts in the light most favorable to Gross. A defendant may not bootstrap an argument that she should not be liable *on the merits* into an argument that she is protected by absolute immunity. We cannot resolve factual disputes in the *defendants'* favor at this stage to conclude that they are absolutely immune from suit.[7]

With this background in mind, we analyze the judicial and quasi-judicial immunity

[7] Indeed, at least at one juncture — with regard to Gross's forcible return to Grove Manor from New York — Donovan concedes that the probate court did *not* have actual knowledge of what was happening, suggesting only that "it can reasonably be *inferred* that returning Gross to Grove Manor was done under the supervision, knowledge, and implied consent of the Court." Brief for Defendant-Appellee Donovan at 22 (emphasis added). Because we must draw all inferences in the light most favorable to the plaintiff, we must decline Donovan's invitation to reasonably infer that she forcibly returned Gross to Grove Manor from New York "under the supervision, knowledge, and implied consent of the Court."

-18-

questions as to Brunnock, Donovan, Newman, and Grove Manor.

**II.     Judicial Immunity: Judge Thomas P. Brunnock**

Plaintiff makes several claims against Brunnock, including violation of the Americans with Disabilities Act, conspiracy (per 42 U.S.C. § 1985), violation of due process rights, abuse of process, and negligent and intentional infliction of emotional distress.  It is unnecessary to parse the specifics of each claim because the only issue on appeal is immunity.  We affirm the grant of judicial immunity as to the judge.

The problems in this case began when Brunnock signed an order on August 25, 2005 indicating that a hearing would occur on September 1 — and that Gross was to be notified of the hearing by *August 24*.  Moreover, there is no indication that Gross even learned of the hearing until August 30, just two days prior.  Additional diligence on Brunnock's part could have uncovered the fact that Gross was neither a resident nor a domiciliary of Connecticut; as Judge Gormley of the Superior Court noted at the hearing on the habeas petition, there was not "a scintilla of evidence that [Gross was] a resident or domiciliary of the state of Connecticut."  Obviously, Brunnock to some extent had to rely on the representations of Gross's appointed counsel, but — in particular, knowing that Gross was not served with notice of the hearing until past the statutory deadline, and obviously aware of the fact that Gross was not at the hearing itself — it would have been advisable to inquire further into the facts.  Indeed, as Judge Gormley noted, "Mr. Gross doesn't get to go to the hearing, or get notice of the hearing, and has no ability to say to anybody[, ']I don't live here.['] . . . [T]his case has disturbed me from day one.  I kept looking for some evidence that would support what has taken place in this case but I find none . .

-19-

. ."

Nevertheless, Brunnock's mishandling of the case is insufficient to defeat judicial immunity. "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability *only when he has acted in the clear absence of all jurisdiction*." *Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978) (internal quotation marks omitted and emphasis added). The critical question is whether he had jurisdiction. *Id.* at 356. However, there is a difference between *exceeding* jurisdiction and acting in the *absence* of jurisdiction:

> if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction and would not be immune from liability for his action; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune.

*Id.* at 357 n.7. Judicial immunity is not defeated "even when the judge is accused of acting maliciously and corruptly." *Pierson v. Ray*, 386 U.S. 547, 554 (1967).

Gross suggests that it should be easier to defeat judicial immunity when the judge in question is sitting on a court of limited jurisdiction. However, this is not the law. Admittedly, some discussion in *Stump* suggests that the judge was immune because he sat on a court of general jurisdiction. *See Stump*, 435 U.S. at 357 (noting that the judge had "original exclusive jurisdiction in all cases at law and in equity whatsoever") (internal quotation marks omitted). The point is not that a judge on a court of general jurisdiction enjoys "more" immunity than one on a court of limited jurisdiction. Rather, the point is that a judge on a court of general

-20-

jurisdiction is less likely to have acted in the clear absence of all jurisdiction.

More to the point, the discussion in these cases — and in the parties' briefs in this case — involve an "elastic," and therefore imprecise, "concept of jurisdiction." *United States v. Cotton*, 535 U.S. 625, 630 (2002). In this context, a court acts in the absence of all jurisdiction when it does not have any "statutory or constitutional *power* to adjudicate the case." *Id.* (internal quotation marks omitted). Here, it is undisputed that Brunnock had the power to adjudicate conservatorship applications. The defect arose out of the erroneous conclusion that Gross was a resident of Connecticut. This erroneous legal conclusion is insufficient to strip the judge of immunity.

In *Maestri v. Jutkofsky*, 860 F.2d 50 (2d Cir. 1988), we addressed judicial immunity in the context of a lawsuit against a town justice. In that case, the plaintiffs were arrested, based on an arrest warrant issued by the defendant, in the town of Germantown. However, the defendant was a town justice in Taghkanic, which is not adjacent to Germantown. By statute, town justices have jurisdiction "only in the town in which the offense was committed [or, in certain circumstances,] any adjoining town within the same county." *Id.* at 52. We explained in *Maestri* that "a judge will be denied immunity only where it appears, first, that the judge acted in the clear absence of jurisdiction, and second, that the judge *must have known* that he or she was acting in the clear absence of jurisdiction." *Id.* at 53 (emphasis added). In that case, we held that immunity did not apply, because the offense in question occurred in a non-adjoining town, and "[n]o reasonable town judge would have thought himself to have had jurisdiction over a non-adjoining town." *Id.*

-21-

Gross seizes on that language here, arguing that no reasonable Connecticut Probate Court judge would have thought he had jurisdiction over a New York resident. This misses the crucial distinction between *Maestri* and this case, *viz.*, that it was undisputed that the judge in *Maestri* knew the plaintiffs were from a town over which he had no jurisdiction. *See id.* at 51-52. Here, Brunnock had subject matter jurisdiction over cases like Gross's, and though it was ultimately held that he did not have personal jurisdiction over Gross, Brunnock did not know it at the time. Immunity therefore applies.

Plaintiff also argues that Brunnock knew or should have known that he did not have jurisdiction as of the September 1, 2005, hearing, because (1) the notice that Brunnock signed on August 25 was facially defective, as it did not allow for the statutorily-mandated seven days' notice, *see* CONN. GEN. STAT. ANN. § 45a-649(a); (2) the return of service indicated that Limauro, and not Gross himself (or his attorney), was the person served; and (3) Newman's report to the court indicated that Gross lived in New York, so that a reasonable judge would have, at a minimum, engaged in further fact-finding to determine if jurisdiction were proper. These claims find some support in the statute, which provides that the respondent must be given seven days' notice of a hearing and that he himself must be served. Moreover, if the respondent wishes to attend the hearing, the judge *must* either hold the hearing in a convenient location or visit the respondent. *Id.* § 45a-649(a)-(b).

But as the Supreme Court has instructed, "judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson*, 386 U.S. at 554. Moreover, "the scope of the judge's jurisdiction must be construed broadly where the issue is the

immunity of the judge." *Stump*, 435 U.S. at 356. Brunnock clearly had jurisdiction over cases *like Gross's*. The judge simply did not have jurisdiction over Gross's case itself. Indeed, as a recent Connecticut Appellate Court case explains, "[a] judge does not act in the complete absence of authority, even if she acts erroneously, unless the judicial conduct is so far outside the normal scope of judicial functions that the judge was in effect not acting as a judge." *Leseberg v. O'Grady*, 115 Conn. App. 18, 23 (2009) (internal quotation marks omitted). That test is not met here; ruling on conservatorship applications and related matters are judicial functions within the realm of a probate judge. *See id.* at 24. A judge's "fail[ure] to comply fully with statutory procedures," as was the case here, is insufficient to strip the judge of immunity. *Id.* at 23.

The foregoing analysis applies to state as well as federal claims. As explained above, Connecticut's common law of judicial immunity is, so far as relevant here, the same as the federal test. *See Shay v. Rossi*, 253 Conn. 134, 170 (2000) (citing *Stump v. Sparkman*, 435 U.S. 349, 364 (1978)), *overruled on other grounds*, *Miller v. Egan*, 265 Conn. 301 (2003); *Leseberg v. O'Grady*, 115 Conn. App. 18, 22 (2009) (citing *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991)). For the reasons discussed above, we hold that Brunnock is entitled to judicial immunity on state law claims.

Thus, Brunnock did not act in the clear absence of subject matter jurisdiction, and he was not aware of the defects in personal jurisdiction, making judicial immunity appropriate. We therefore affirm the District Court's grant of judicial immunity to Brunnock and its dismissal of

-23-

all claims against him.[8]

**III.    Quasi-Judicial Immunity**

**A.    Federal vs. State Law**

As discussed above, there are two distinct but related questions in this case: first, whether Donovan, Newman, and Grove Manor are entitled to the defense of absolute quasi-judicial immunity as to federal claims (a question of federal law), and second, whether Donovan and Newman are entitled to such immunity as to state law claims (a question of state law). We are certifying questions as to both of these issues. We are certifying questions regarding the state law issue because the Connecticut Supreme Court has not definitively spoken on the subject of quasi-judicial immunity for conservators and court-appointed attorneys for conservatees.

We are also certifying a question that relates to the federal law question. We do so because application of the factors the Supreme Court has outlined intersects unsettled questions of Connecticut state law and policy. Therefore, we ask the Connecticut Supreme Court to give us guidance as to the role of conservators, attorneys, and nursing homes within the Connecticut probate court system. Upon receiving this guidance, we will decide the federal claims at issue here.

---

[8] *Case v. Bush*, 93 Conn. 550 (1919), does not change the analysis. According to a treatise, *Case* stands for the proposition that a judge who acts without subject matter jurisdiction could be subject to civil liability. *See* RALPH H. FOLSON & GAYLE B. WILHELM, PROBATE JURISDICTION & PROCEDURE IN CONN. § 2:5, at 2-19 (2d ed. 2008). However, *Case* significantly predates the U.S. and Connecticut Supreme Courts' authorities on the question and, most important, does not distinguish between a judge *exceeding* his jurisdiction and acting in the clear *absence* of jurisdiction, which is the relevant legal test.

We note that, in practice, the division between the federal and state law issues may vanish. As we explain *infra*, the Connecticut Supreme Court, in its most recent case on quasi-judicial immunity, explained that it was adopting U.S. Supreme Court case law on the subject. It does not appear to us that the federal and Connecticut tests diverge much, if at all. However, we do not presume to decide the contours of Connecticut law.[9] After all, the Connecticut Supreme Court may expand, restrict, abandon, or otherwise modify its current state common law doctrine on this point. Even if that is the case, we would nonetheless find helpful a discussion of the role

---

[9] A recent case from the D.C. Circuit illustrates the potential for difference. In *Atherton v. District of Columbia*, 567 F.3d 672 (D.C. Cir. 2009), the court had to address the question of whether a juror officer and an Assistant United States Attorney were entitled to quasi-judicial immunity for dismissing a juror, allegedly on account of his ethnicity. The D.C. Circuit employed a three-part functional analysis based on *Butz* to determine the question of quasi-judicial immunity, *see id.* at 683, just as the Connecticut Supreme Court did, *see Carrubba*, 274 Conn. at 542-43.

However, Connecticut seems to extend immunity to those who are "performing a function that was integral to the judicial process." *Id.* at 542. The D.C. Circuit, on the other hand — relying on the same Supreme Court case as Connecticut — seems to extend immunity only to those who are exercising a judicial function or acting in a way integrally related to *adjudication*. *See Atherton*, 567 F.3d at 683. For example, in *Atherton*, the D.C. Circuit explained that the juror officer "was not involved in the resolution of any factual or legal issue; and her responsibilities did not involve handling any pleadings, disputes, or controversies of law." *Id.* at 683-84. Thus, even officials who are important in providing the necessary conditions for the operation of the judicial system are not protected by immunity unless they are performing adjudicative functions. *See id.* at 684. The D.C. Circuit, relying at least in part on the same cases as the Connecticut Supreme Court, appears to have developed a test for quasi-judicial immunity that is narrower than that in Connecticut.

We note this difference, not to suggest that the Connecticut test is "incorrect," but only to point out how a federal court and a state court, employing the same legal framework, may come to different conclusions when one is applying federal law and the other is applying state law. Such an outcome may or may not arise in this case, but such a possibility is what requires us to certify two sets of questions.

of the various actors in the Connecticut probate system in light of the federal law factors as enunciated in *Cleavinger*.

Of course, if Connecticut's *state law* analysis of quasi-judicial immunity relies on the same factors as the federal law test, then the Connecticut Supreme Court will so advise us.

In either event, we will ultimately apply and elaborate on the *federal law* test for quasi-judicial immunity. First, in light of the guidance received by the Connecticut Supreme Court, we will decide whether the defense of quasi-judicial immunity is available to these defendants at all. Then, we may also need to decide related questions, such as whether the defense should be raised at a motion to dismiss, or at a later stage. If we conclude that quasi-judicial immunity applies to any of the federal claims against the defendants, we may also need to answer the second-order question of precise scope and contours of that immunity. These determinations would be made as a matter of federal law.

Therefore, although state and federal law questions are posed with regard to each defendant, we do not bifurcate our analysis below.

**B.    Conservator Kathleen Donovan**

Gross pleads several federal and state law claims against the former conservator, Kathleen Donovan: conspiracy pursuant to § 1985, violation of his right to due process, negligent and intentional infliction of emotional distress, breach of fiduciary duty, false arrest and tortious assault, and false imprisonment. The District Court dismissed all of these claims, concluding that Donovan, as a court-appointed conservator acting pursuant to the Probate Court's order, was entitled to quasi-judicial immunity. The District Court wrote,

Donovan's argument to extend Judge Brunnock's judicial immunity to her actions is a simple one as the law is clear and well established. Donovan was acting as an agent of the Probate Court, at the direction and under the supervision of Judge Brunnock. If Judge Brunnock is immune from suit, than [*sic*] Donovan as conservator acting as his agent or at his direction must be immune.

However, we are not of the view that "the law is clear and well-established." To the contrary, as we read them, the statutes and case law in Connecticut do not sufficiently enable us to analyze the factors set forth by the Supreme Court in deciding when an individual is entitled to quasi-judicial immunity.

At the outset, we note that Donovan is correct: courts are willing to extend absolute judicial immunity to those who "perform functions closely associated with the judicial process." *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985). Those who seek this absolute immunity bear the burden of demonstrating that public policy requires such a broad exemption from suit. *See id.* at 201. The Supreme Court has set forth a "functional" approach to determine whether a particular individual is entitled to quasi-judicial immunity. The factors include

(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Id.* at 202; *see also Butz v. Economou*, 438 U.S. 478, 511-12 (1978) (describing the factors in greater detail).

In this case, the application of these factors directly intersects the nature and function of the Connecticut probate court system and considerations of Connecticut public policy. For

-27-

example, although all individuals connected to the judicial process in some way would surely like to "perform [their] functions without harassment or intimidation," *Cleavinger*, 474 U.S. at 202, certain of those individuals enjoy absolute immunity, *see, e.g.*, *Imbler v. Pachtman*, 424 U.S. 409 (1976) (prosecutors entitled to absolute immunity) , while others do not*, see, e.g.*, *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993) (court reporters not entitled to absolute immunity). Which side of the line a court-appointed conservator falls on necessarily involves questions regarding the role of a conservator in Connecticut and the way that position is envisioned in Connecticut's statutory and common law scheme.

Connecticut case law is not sufficiently on point to provide a rule of decision here. In *Carrubba v. Moskowitz*, 274 Conn. 533 (2005), the Connecticut Supreme Court held that court-appointed counsel for minor children were entitled to quasi-judicial immunity. The court began the analysis by noting that the "extension [of judicial immunity to others] generally has been very limited." *Id.* at 540. Moreover,

> not every category of persons protected by immunity are entitled to *absolute* immunity. In fact, just the opposite presumption prevails — categories of persons protected by immunity are entitled only to the scope of immunity that is necessary to protect those persons in the performance of their duties. The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.

*Id.* at 541 (internal quotation marks and alteration omitted). These comments might lead one to conclude that courts should be very reluctant to expand the reach of quasi-judicial immunity.

However, after adopting the U.S. Supreme Court's functional approach, the court determined that court-appointed counsel for minor children *were* entitled to absolute immunity.

-28-

The court reasoned that court-appointed counsel for minor children were "subject to the court's discretion," could "be removed by the court at any time," and were, "just as any other attorney, . . . subject to discipline for violations of the Code of Professional Conduct." *Id.* at 543. The court emphasized that court-appointed counsel for minor children served a dual function; in addition to being attorneys advocating their clients' (i.e., the child's) wishes, they must "promot[e] the best interests of the child," *id.* at 544, which involves "be[ing] more objective than a privately retained attorney," *id.* at 545. The court acknowledged that the "dual obligations imposed on the attorney for a minor child . . . are not easily disentangled." *Id.* However, the role as advocate "must always be subordinated to the attorney's duty to serve the best interests of the child." *Id.* at 546. The court also distinguished the case of representing a child — which "imposes a higher degree of objectivity on [an] attorney" — from that of representing an adult. *Id.* at 545 (internal quotation marks omitted).

Thus, after explaining that the attorney had an objective role (i.e., not purely as an advocate) that made her integral to the judicial process, and that the complaint made no allegation that the attorney "acted outside the usual role of an attorney for the minor children," the court concluded that the attorney was entitled to absolute quasi-judicial immunity. *Id.* at 549.

Relying primarily on *Carrubba*, Donovan argues that she should be immune from suit. *Carrubba*, however, is not sufficiently instructive. The application of the factors set forth in *Cleavinger* to the circumstances of this case (a federal question) depends on the nature of the role a conservator serves under Connecticut law, a topic that *Carrubba* does not discuss. Therefore, we think it most prudent to seek the assistance of the Connecticut Supreme Court with respect to

the *Cleavinger* factors.

Indeed, Connecticut law seems to recognize that, in certain circumstances, conservators *can* be liable for their official actions. First, a probate court is required by statute to require the posting of a probate bond if it appoints a conservator for the estate of a respondent. *See* CONN. GEN. STAT. ANN. § 45a-650(g). The court also has the ability, in its discretion, if it appoints a conservator of the person, to require the conservator to post a bond "for the protection of the respondent." *Id.* The court did not require such a bond in this case, which Gross claims was part of the conspiracy against him. Regardless, the fact that the law requires a probate bond, and permits a bond for the protection of the conserved person, suggests that the legislature was aware of the possibility of conservators' liability.

The Connecticut Supreme Court's decision in *Jewish Home for the Elderly of Fairfield County, Inc. v. Cantore*, 257 Conn. 531 (2001), is instructive. The home at which the decedent stayed sued the conservator when the conservator did not pay it for its services. It alleged "an action on the probate bond to recover for the loss it suffered as a result of [the conservator's] failure to ensure timely payment for [the conservatee Kosminer's] care." *Id.* at 539. The Connecticut Supreme Court determined that the complaint had stated a claim against Cantore and that the home had standing to bring its claim. *Id.* at 543. It held that Cantore had a duty, among other things, to use Kosminer's estate to support her and pay her debts. *Id.* at 540. Thus, the Connecticut Supreme Court's holding in the *Cantore* litigation seems to recognize that a conservator can be sued in an action on the probate bond when he fails to perform his duty.

Moreover, a conservator is defined as a fiduciary, *see* CONN. GEN. STAT. ANN. § 45a-

-30-

199, and fiduciaries "who[,] in good faith[,] make[] payments . . . pursuant to the order of the court of probate having jurisdiction before an appeal has been taken from such order, shall not be liable for the money so paid . . . even if the order under which such payment . . . has been made is later reversed, vacated, or set aside," *id.* § 45a-202(a). It could be, however, that a fiduciary *may* be liable (1) if he did not act in good faith, (2) if the probate court lacked jurisdiction, or (3) if he acted *after* an appeal was taken and the underlying order is reversed.

Thus, Connecticut law seems to imply that (at least certain types of) conservators may be liable in certain circumstances. This suggests that conservators do not have absolute immunity from suit (the first-order question) but that they may raise certain affirmative defenses to liability. In such a context, it appears inappropriate for us to hold that conservators are absolutely immune from suit.

It would be particularly inappropriate for us to so hold because, in other contexts, Connecticut law explicitly recognizes certain conservators' immunity. By law, "[a]ll receivers or conservators *of trust banks or uninsured banks* . . . shall be immune from suit and liability, both personally and in their official capacities . . . ." CONN. GEN. STAT. ANN. § 36a-237h(a)-(b) (West 2008 pocket part) (emphasis added). Moreover, immunity under this section *does not* extend to attorneys retained by the conservator, *id.* § 36a-237h(a), or to "intentional or wilful and wanton misconduct of the receiver or conservator," *id.* § 36a-237h(b). Other types of conservators are similarly immune, s*ee, e.g.*, *id.* §§ 45a-683 (guardians of people with mental retardation). These provisions do not apply to the kind of conservator at issue in this case. The fact that the legislature specifically made several types of guardians and conservators immune but not others

-31-

lends support for the proposition that conservators like Donovan are *not* immune or that, if such immunity exists, it is not absolute. *Inclusio unius est exclusio alterius*.

To be sure, the Connecticut Supreme Court may disagree and conclude that it is more consistent with the overall statutory scheme to hold that conservators like Donovan *are* immune despite the fact that no statute explicitly confers immunity. For example, the court may reason that if other conservators are immune, Donovan should be as well. This underscores the rationale for certification; the state court is in a better position to speak to that question of state policy. *Cf. See Sealed v. Sealed*, 332 F.3d 51, 59 (2d Cir. 2003) ("Where a question of statutory interpretation implicates the weighing of policy concerns, principles of comity and federalism strongly support certification.") (citation omitted).

Admittedly, other federal cases have held that a conservator *is* entitled to quasi-judicial immunity. *See, e.g.*, *Cok v. Cosentino*, 876 F.2d 1 (1st Cir. 1989) (per curiam); *Collins v. West Hartford Police Department*, 380 F. Supp. 2d 83 (D. Conn. 2005); *Rzayeva v. United States*, 492 F. Supp. 2d 60 (D. Conn. 2007); *Sasscer v. Barrios-Paoli*, No. 05-cv-2196, 2008 WL 5215466, at *5 n.5 (S.D.N.Y. Dec. 8, 2008).[10]

Donovan suggests that conservators are simply an arm of the probate court. But this is not the end of the inquiry. Although "it is clear that the conservator acts under the supervision and control of the Probate Court," they do so "*in the care and management of the ward's estate*" or person. *Probate of Marcus*, 199 Conn. 524, 529 (1986) (emphasis added). Indeed, *Marcus*,

---

[10] *Collins* is currently on appeal before our court. However, to the extent that *Collins* overlaps, our panel has precedence, because *Collins* has not yet been heard.

which Donovan cites, held that it was impermissible for a conservator to make a gift to herself from the ward's estate. (The conservatrices sought to make such a gift, the probate court denied them permission, and they appealed.) *Id.* It seems at first cut illogical to hold that, if the conservatrices in that case made such an *ultra vires* distribution, they would be absolutely immune from suit by the ward, even though the actions they took were clearly impermissible.

In sum, our conclusion as to quasi-judicial immunity as to federal claims against Donovan is governed by the *Cleavinger* factors. The analysis of those factors implicates questions of Connecticut state law that, as described above, are not entirely clear. For example, there is obviously a need to assure that conservators can operate without the threat of harassing litigation, but Connecticut courts, familiar with the role of the conservator within that state's system, may believe that this factor deserves less weight than we might otherwise give it. Similarly, the Connecticut Supreme Court might inform us that there are strong procedural safeguards in place (the second factor), but that these are undercut by the fact that probate judges in Connecticut are elected (the third factor). The Connecticut court can also assist us in determining, for example, the chances of errors being corrected on appeal or the role of precedent in the Connecticut probate system.[11]

Therefore, as to Gross's federal claims against Donovan, we certify a question to the Connecticut Supreme Court. We ask the court to explain the role and function of a court-

---

[11] Defendants have argued that plaintiff implicitly recognized that the judge's orders were proper because there was no appeal. This ignores the obvious fact that if one is held to be incompetent, possibly without notice, it is difficult if not impossible to file an appeal.

appointed conservator, in the context of Connecticut's probate court system, in light of the factors set forth by *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985). Upon receiving the Connecticut Supreme Court's response, we will decide whether quasi-judicial immunity extends to conservators as a matter of federal law, and if so, the second-order question of what the precise scope of that immunity is.

As to the state claims against Donovan, we simply certify the question of whether conservators are entitled to quasi-judicial immunity. Regarding the state law claims, the Connecticut Supreme Court's determination will be final.

### C. Attorney Jonathan Newman

Gross makes several federal and state claims against Newman: conspiracy (by way of § 1985), violation of his right to due process, intentional and negligent infliction of emotional distress, and malpractice. Although Donovan and Newman are both attorneys, there is a significant caveat: Newman, as Gross's attorney, was an advocate, while Donovan, as the conservator, was not. The parties seem to dispute whether Newman's role was *solely* that of an advocate (Gross's position) or whether he was to advocate Gross's views tempered by his own judgment (Newman's position). However, it is clear that, at least to some extent, Newman was supposed to act as an advocate. Therefore, his role was to some degree less as an "arm of the court," and he has a correspondingly weaker claim to quasi-judicial immunity.

The *Cleavinger* factors are relevant here, as they were for Donovan:

(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c)

-34-

insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

474 U.S. at 202.

Newman argues that he is entitled to quasi-judicial immunity because he was acting as an arm of the court, noting that he was "appointed by the [probate] court to represent the interests of a person being considered for a conservatorship." Brief of Defendant-Appellant Newman at 6. However, this statement misleadingly evokes the "best interests" standard that applies to court-appointed counsel for minor children. *See Carrubba*, 274 Conn. at 544-45 (holding that counsel for a minor child has a "duty to secure the best interests of the child"). By contrast, the statute on conservatorships indicates that the court may appoint an attorney to "represent the respondent," CONN. GEN. STAT. ANN. § 45a-649(b)(2), with no mention of "best interests." In light of this statute, Newman's argument that "[a] physician *has already determined* that the person is" incompetent and therefore "the attorney could not simply parrot the client's wishes, but was obligated to assist the court in serving the client's best interest," is particularly weak. It also appears to misconstrue the nature of the proceedings. The court must find by clear and convincing evidence *that* the respondent is incompetent. *Id.* § 45a-650(d). Until that time, the respondent is like any other competent client. Moreover, *after* the conservator is appointed, *she* is the one who manages the ward's affairs and his person. *Id.* Thus, if anyone, it is the conservator who exercises independent judgment as against the ward's wishes, not the attorney. Indeed, one can imagine that the system works best when the conservator reports to the court an independent judgment about what the ward's "best interests" would be, and the attorney

-35-

advocates for his client's wishes, with the probate court ultimately responsible for the ward's protection. Of course, whether such a system "works best" is a matter of Connecticut policy.[12]

Newman also points to various facts that he says support his claim that he acted properly: Gross could not attend the hearing because he was in the hospital (though alternative arrangements could have, and by statute must have, been made); signing papers as "attorney for ward" when Gross had not yet been adjudged incompetent was merely a technical error; the lack of notice was curable; and so on. However, just as with Donovan, Newman may not bootstrap his arguments on the *merits* into an argument for *immunity*. At this stage, we must take all facts in the light most favorable to Gross. The only issue on appeal is that of quasi-judicial immunity. Whether Newman was or was not negligent is not before us.

Instead, our analysis is governed by the *Cleavinger* factors, and as with Donovan, that analysis implicates questions of state probate law. For example, though attorneys typically should operate without the threat of harassing litigation, Connecticut policy may favor giving relatively less protection for attorneys appointed for conservatees than for those for minor children. *Cf. Carrubba*, 274 Conn. at 541-42 (noting that prosecutors in Connecticut are entitled to absolute immunity but public defenders are entitled to only qualified immunity). As with Donovan, the Connecticut Supreme Court might inform us that there are strong procedural safeguards in place (the second factor), but that these are undercut by the fact that probate judges in Connecticut are elected (the third factor). The *Cleavinger* analysis is also affected by the fact

---

[12] We note that Newman's citation to *Lesnewski v. Redvers*, 276 Conn. 526 (2005) appears entirely inapposite.

that Newman has *some* role as an advocate, making him commensurately *less* of an "arm of the court."

Therefore, as to Gross's federal claims against Newman, we certify a question to the Connecticut Supreme Court. We ask the court to explain the role and function of a court-appointed attorney for a conservatee, in the context of Connecticut's probate court system, in light of the factors set forth by *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985). Upon receiving the Connecticut Supreme Court's response, we will decide whether quasi-judicial immunity extends to court-appointed attorneys for conservatees as a matter of federal law, and if so, the second-order question of what the precise scope of that immunity is.

As to the state claims against Newman, we simply certify the question of whether court-appointed attorneys for conservatees are entitled to quasi-judicial immunity. As to the state law claims, the Connecticut Supreme Court's determination will be final.

### D.  Grove Manor Nursing Home

Gross pled six claims against Grove Manor: two civil rights conspiracy claims pursuant to § 1985, two statutory violations (concerning the Omnibus Budget Reconciliation Act of 1989 and the Patients' Bill of Rights), and emotional distress (intentional and negligent). Of these, the civil rights claims are preserved on appeal and the remainder are waived. However, as to the emotional distress claims, dismissal was without prejudice and these claims may be reasserted in the future.

#### 1.  Civil Rights Claims

The civil rights claims against Grove Manor rise and fall with the determination of quasi-

judicial immunity. If the conservator and attorney have quasi-judicial immunity, then the nursing home may as well, at least to the extent that it was merely carrying out their orders. If they do not, then the nursing home likely does not. For the reasons discussed above in connection with Donovan and Newman, we certify questions regarding the nursing home's immunity as well. However, we note that the case for derivative immunity is weakest with regard to the nursing home. Grove Manor was furthest removed from the judicial process. Moreover, no court case that we have found extends judicial immunity to an *institution* (as opposed to an individual).

Once again, our analysis is governed by the *Cleavinger* factors. We will not rehash them here, but we note that, as with Donovan and Newman, the application of those factors to Grove Manor implicates Connecticut probate law. Because Grove Manor is more removed from the judicial process than Donovan or Newman, it may have a weaker case for immunity. However, despite this fact, the policy considerations may exist that militate toward finding Grove Manor immune, particularly if Donovan and Newman are immune. The Connecticut Supreme Court is in the best position to address these questions in the first instance. Therefore, as to Gross's federal claims against Grove Manor, we certify a question to the Connecticut Supreme Court. We ask the court to explain the role and function of a nursing home in the context of Connecticut's probate court system, in light of the factors set forth by *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985). Upon receiving the Connecticut Supreme Court's response, we will decide whether quasi-judicial immunity extends to nursing homes as a matter of federal law, and if so, the second-order question of what the precise scope of that immunity is.

## 2. Statutory and Tort Claims

The District Court declined to grant Grove Manor quasi-judicial immunity as to the statutory claims and the tort claims. The District Court reasoned that these causes of action went to Grove Manor's decision to assign Gross to a particular room, to assign him a particular roommate, and to keep him in the room with the roommate after the roommate attacked him. The District Court concluded that these decisions were discretionary and not specifically called for by court order; thus, even if immunity applied to Grove Manor, it would not apply to these discretionary acts.

The District Court went on to dismiss plaintiff's statutory claims because he did not discuss them in his opposition to Grove Manor's motion to dismiss. We affirm the dismissal of these claims because they were waived below and are not discussed in the plaintiff's opening brief on appeal (other than in connection with whether Grove Manor has quasi-judicial immunity).

This leaves the intentional and negligent infliction of emotional distress claims against the nursing home. As noted above, these claims survived the District Court's quasi-judicial immunity analysis. Roughly three weeks later, the District Court held a telephone conference to get further background on the case and determine issues for discovery and the subsequent course of litigation. Then, at the very end of that conversation, the following transpired:

> [THE COURT:] So with respect to the ombudsman the period of
> non-economic damages would not exceed two months[, the time
> from Ewald receiving the complaint and Gross being released].
> And with respect to the nursing home the period of non-economic
> damages would not exceed four days[, the time after Gross getting
> attacked and the nursing home reassigning him to a different
> room]. Is that inaccurate?

MR. PETERS[, counsel for Gross]: With the facts before me I can't say that it is, your Honor.

THE COURT: All right. Given that, of course you understand that in order to sustain an action in district court there has to be a showing by you, the plaintiff, that your damages are $75,000 or greater. And to be honest with you, I'm at a loss to see how that could possibly be the case on these facts. I don't believe I have [subject-matter] jurisdiction.

That's not to say that if I dismiss this case you would not be able to file it in superior court. But I don't believe you have Federal Court jurisdiction any longer given the remaining claims and the extent of the damages associated with those remaining claims.

MR. PETERS: We all – we would like to – I mean, we would not oppose that analysis which would call for you dismissing the case because then we could appeal.

THE COURT: That you could. All right.

Do you want to withdraw the case?

MR. PETERS: No.

THE COURT: Do you object to the dismissal of the case?

MR. PETERS: No, I do not.

THE COURT: All righty, I'll enter the order.

Gross does not address this issue in his principal brief. This constitutes waiver. *See, e.g.*, *Zhang v. Gonzalez*, 426 F.3d 540, 541 n.1 (2d Cir. 2005). Gross refers to the emotional distress claims in his reply brief and points out that his arguments about them were raised at the District Court. However, this is also insufficient to properly present an issue on appeal. *See McCarthy v. S.E.C.*, 406 F.3d 179, 186 (2d Cir. 2005) ("[A]rguments not raised in an appellant's opening

-40-

brief, but only in his reply brief, are not properly before an appellate court *even when the same arguments were raised in the trial court*.") (emphasis added). Merely mentioning the relevant issue in an opening brief is not enough; "[i]ssues not sufficiently argued are in general deemed waived and will not be considered on appeal." *Frank v. United States*, 78 F.3d 815, 833 (2d Cir. 1996), *vacated on other grounds*, 521 U.S. 1114 (1997). "[S]imply stating an issue does not constitute compliance with [Federal Rule of Appellate Procedure] 28(a): an appellant or cross-appellant must state the issue *and* advance an argument." *Id.* Because Gross did not advance any argument until the reply brief, the issue is waived.

Accordingly, we affirm the dismissal of the statutory and tort claims against Grove Manor. The tort claims may be reasserted in the future as they were dismissed without prejudice.[13]

### E. Sanctions Other Than Civil Liability

In *Carrubba*, the Connecticut Supreme Court recognized that, even though a court-appointed attorney for a minor child might be absolutely immune from suit, he or she, "just as any other attorney, is subject to discipline for violations of the Code of Professional Conduct." *See* 274 Conn. at 543. Similarly, even if Brunnock, Donovan, Newman, and Grove Manor were immune from suit, they may be subject to discipline for violations of their respective professional

---

[13] Unlike Donovan and Newman, no state-law claims remain as to Grove Manor. Therefore, we need not certify a separate question as to whether, as a matter of state law, nursing homes may enjoy quasi-judicial immunity. However, because dismissal was without prejudice, there is a possibility of that question arising in the future. We note this only to point out that this posture may affect the Connecticut Supreme Court's handling of the certified question.

-41-

ethics rules and/or licensing requirements. The question of whether defendants violated such obligations is not before us. However, we note this fact because the possibility of such discipline may affect the Connecticut Supreme Court's analysis. Moreover, referral to disciplinary authorities, if any, would be a matter of state, not federal, law.

**IV.    Governor M. Jodi Rell and Ombudsman Maggie Ewald**

Gross alleged that Rell violated the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and negligently inflicted emotional distress. He alleges that Ewald violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the First Amendment, and that she intentionally and negligently inflicted emotional distress.

Gross does not discuss these claims in his opening brief. (The ADA, First Amendment, and Rehabilitation Act claims are not mentioned at all and the emotional distress claims are only mentioned in connection with Donovan and Newman.) Rell and Ewald argue that these claims should be deemed waived. Gross has now explicitly abandoned all claims against Rell and the Rehabilitation Act claim against Ewald, and does not discuss the First Amendment claim in either his opening or reply brief. However, he argues in his reply brief that the dismissal of the intentional infliction of emotional distress claim against Ewald in her individual capacity should be vacated.[14]

However, we will not consider this argument because it is waived for the reasons

---

[14] Gross pled both intentional and negligent infliction of emotional distress against Ewald, but she enjoys immunity for negligent (but not intentional) torts under state law, CONN. GEN. STAT. ANN. § 4-165. We affirm the District Court's dismissal of that claim.

-42-

discussed above with regard to Grove Manor. Therefore, we affirm the District Court's dismissal of the negligent infliction of emotional distress claim against Ewald. Again, we note that this claim was dismissed without prejudice for failing to exceed the jurisdictional minimum. If the Connecticut Supreme Court concludes that quasi-judicial immunity does not apply to Donovan, Newman, and/or Grove Manor, the claim against Ewald may be reasserted. Moreover, the claim may be reasserted in a separate action in any event.

**CONCLUSION**

For the reasons discussed above, the District Court's decision is AFFIRMED in part and CERTIFIED in part to the Connecticut Supreme Court. We affirm the grant of judicial immunity as to Brunnock and the dismissal of the claims against Rell and Ewald. We also affirm the dismissal of the emotional distress claims against Grove Manor.

However, because there is no controlling appellate decision, constitutional provision, or statute in Connecticut that explains whether conservators and court-appointed attorneys for conservatees enjoy quasi-judicial immunity, we certify the following questions to the Connecticut Supreme Court:

1. Under Connecticut law, does absolute quasi-judicial immunity extend to conservators appointed by the Connecticut Probate Courts?

2. Under Connecticut law, does absolute quasi-judicial immunity extend to attorneys appointed to represent respondents in conservatorship proceedings or to attorneys appointed to represent Conservatees?

In answering these two questions, the Connecticut Supreme Court may, if necessary, also define the scope and contours of any such immunity. The Connecticut Supreme Court's

pronouncement as to these state law questions will be final.

Gross has also pled federal law claims against Donovan, Newman, and Grove Manor. With regard to these claims, we must decide if the *federal* defense of quasi-judicial immunity applies to a conservator, court-appointed attorney for a conservatee, or nursing home. However, our determination of this question implicates questions of Connecticut law and policy. Therefore, we certify an additional question to the Connecticut Supreme Court, asking for its guidance in connection with the *Cleavinger* factors:

> What is the role of conservators, court-appointed attorneys for conservatees, and nursing homes in the Connecticut probate court system, in light of the six factors for determining quasi-judicial immunity outlined in *Cleavinger v. Saxner*, 474 U.S. 193, 201-02 (1985)?

The certified questions may be deemed modified to cover any further pertinent questions of Connecticut law involved in this appeal that the Connecticut Supreme Court chooses to answer. This panel retains jurisdiction and will decide the federal quasi-judicial immunity question as well as any issues that may remain on appeal once the Connecticut Supreme Court has either provided us with its guidance or declined certification.

It is therefore ordered that the Clerk of this Court transmit to the Clerk of the Connecticut Supreme Court a Certificate, as set forth below, together with a complete set of the briefs, appendices, and record filed in this Court by the parties.

The parties shall bear equally any costs or fees imposed by the Connecticut Supreme Court.

**CERTIFICATE**

The foregoing is hereby certified to the Connecticut Supreme Court, pursuant to CONN. GEN. STAT. ANN. § 51-199b and 2d Cir. R. 0.27, as ordered by the United States Court of Appeals for the Second Circuit.