10-4402-cv
Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

August Term, 2011

(Argued: December 2, 2011      Decided: March 7, 2012)

Docket No. 10-4402-cv

———————————

NIAGARA MOHAWK POWER CORPORATION, DBA NATIONAL GRID,

*Plaintiff-Appellant*,

— v. —

HUDSON RIVER-BLACK RIVER REGULATING DISTRICT,
NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION,

*Defendants-Appellees*,

SACANDAGA PROTECTION CORPORATION,

*Intervenor-Appellee*.

———————————

B e f o r e:

HALL, LYNCH, and LOHIER, *Circuit Judges*.

———————————

National Grid challenges the constitutional and statutory authority of the

defendants-appellees to assess it for costs associated with operating and maintaining

certain dams and reservoirs in New York State.  Specifically, National Grid argues that

the Hudson River-Black River Regulating District's assessment authority is preempted by the Federal Power Act, and that the assessment scheme violates National Grid's equal protection rights under the federal constitution and its rights against unlawful takings under the federal and New York constitutions. The district court (Mordue, *C.J.*) rejected National Grid's preemption claims but abstained from exercising jurisdiction over the remaining constitutional claims, which are also pending in numerous state-court actions previously filed by National Grid. We agree that the assessment authority is not federally preempted, but conclude that the district court abused its discretion by dismissing National Grid's remaining constitutional claims on abstention grounds. Accordingly, we affirm the district court's judgment as to preemption and affirm its dismissal of the New York Department of Environmental Conservation from this action, but vacate the judgment as to abstention. We remand the case to the district court for resolution of National Grid's federal and state constitutional claims.

Affirmed in part, vacated and remanded in part.

_____

MARK D. LANSING, Hiscock & Barclay, LLP, Albany, New York, *for Plaintiff-Appellant*.

DAVID M. CHERUBIN, Brown & Weinraub, PLLC, Albany, New York, *for Defendant-Appellee Hudson River-Black River Regulating District.*

OWEN DEMUTH, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Andrew D. Bing, Deputy Solicitor General, *on the brief*), *for* Eric T. Schneiderman, Attorney General of the State of New York, Albany, New York, *for Defendant-Appellee New York State Department of Environmental Conservation.*

BENJAMIN K. AHLSTROM, Hodgson Russ LLP, Buffalo, New York, *for Intervenor-Appellee Sacandaga Protection Corporation.*

_____

GERARD E. LYNCH, *Circuit Judge*:

Plaintiff-appellant Niagara Mohawk Power Corporation, doing business as National Grid ("National Grid"), challenges the constitutional and statutory authority of defendant-appellee Hudson River-Black River Regulating District ("the District"), a New York public benefit corporation, to assess it for benefits that its property along the Hudson River receives from a dam and reservoir that the District operates. National Grid argues that the District's assessment and apportionment scheme is federally preempted by the Federal Power Act ("FPA"), see 16 U.S.C. §§ 803(f), 821, and that even if the assessment authority exists, all assessments made prior to 2010 violated National Grid's equal protection rights under the U.S. Constitution and constituted impermissible takings under the U.S. and New York State constitutions. The district court (Norman A. Mordue, *Chief Judge*) granted summary judgment for the defendants on National Grid's preemption claims but abstained from exercising jurisdiction over (and accordingly dismissed) the remaining constitutional claims, on the theory that they should more properly be addressed in National Grid's previously filed, pending state-court actions.

Because the FPA does not preempt the District's authority under New York state law to assess National Grid as it did here, we affirm the district court's judgment as to federal preemption. We further find that National Grid has abandoned its appeal of the district court's dismissal of the New York State Department of Environmental

3

Conservation ("DEC") from this action, and, in any event, that the district court's dismissal of the DEC was proper. However, because we conclude that abstention was not warranted as to National Grid's remaining constitutional claims, we remand those claims to the district court for resolution, expressing no view on their merits.

## BACKGROUND

### I. The Parties

#### A. Defendants-Appellees

Defendant-appellee the District is a New York State public benefit corporation, created in 1959 by legislation that combined two existing districts – the Hudson River Regulating District (formed in 1922) and the Black River Regulating District (formed in 1919). The District is charged with regulating the flow of those rivers as "required by the public welfare, including health and safety." See N.Y. Envtl. Conserv. L. § 15-2103(1); see also id. § 15-2139(2). New York law gives the District broad powers to carry out its mission, including the authority to build and operate reservoirs, issue bonds, and apportion costs on statutorily defined beneficiaries to finance the construction, maintenance, and operation of its reservoirs. Id. §§ 15-2103(1), 15-2109, 15-2111, 15-2123, 15-2125, 15-2129, 15-2133.

The DEC is a New York state agency tasked with implementing and enforcing New York's Environmental Conservation Law. Among its duties, the DEC approves proposed apportionments certified by the District's board, id. § 15-2121(4), (5), and reviews "all necessary rules and regulations" that the board of the District has the "power

4

to make," id. §§ 15-2109(1), 15-2109(3).  The DEC does not set downstream-beneficiary assessment rates, nor is it authorized to audit or revise the apportionments set by the District.

In 1923, the New York State Water Control Commission, the DEC's predecessor, approved the Hudson River Regulating District's proposed General Plan for regulating the flow of the Hudson River and its tributaries.  This plan provided, among other things, for the construction of the Conklingville Dam and the Sacandaga Reservoir, now known as the Great Sacandaga Lake Reservoir (collectively the "GSL Project").  New York law required that the Hudson River Regulating District "apportion [the] cost [of constructing the Great Sacandaga Lake Reservoir], less the amount which may be chargeable to the state, among the public corporations and parcels of real estate benefited, in proportion to the amount of benefit which will inure to each such public corporation and parcel of real estate by reason of such reservoir."  N.Y. Envtl. Conserv. L. § 15-2121.

1. Assessment and Apportionment

From 1925 until 2010, the District (including its predecessor the Hudson River Regulating District) used the same method for assessing the beneficiaries of the GSL Project.[1]  Under this method of apportionment for the upper Hudson River watershed

---

[1] In 2009, the District began a reapportionment, which it completed in 2010. However, any changes implemented under reapportionment, and any differences between the previous assessment scheme and the present one, are irrelevant to this appeal.  National Grid's preemption claim makes no distinctions between the old and new scheme, and at oral argument its counsel indicated that its equal protection and takings claims arise solely from the old assessment scheme.  In any event, because we remand the equal protection and

5

area, the District attributed roughly 95% of the GSL Project's benefits to parcels of land with a fall (or "head") on the river, and that therefore either derived or had the potential to derive the benefit of increased water-power production from the GSL Project – regardless of whether the property was used for hydroelectric purposes or industrial purposes, or was undeveloped. Among these "head" parcels, the District further allocates costs based on the amount of "head" each landowner possesses on the assessed portion of the Hudson. The District allocates the remaining 5% of the project's benefits to municipalities along the river, which enjoy flood control, river-flow augmentation, and various sanitary improvements thanks to the GSL Project.

In the 1990s, the Federal Energy Regulatory Commission ("FERC") determined that the GSL Project required a federal license. Prior to that time, the federal government had expressly declined to require that the District secure a license for the project. But the government's approach shifted in the early 1990s, and federal regulators told the District that a federal license would now be necessary. At first, the District fought this change. Ultimately, however, after some negotiation, the District agreed to become a FERC licensee, and in 2000 signed an Offer of Settlement with the federal government, the Department of Environmental Conservation, and other agencies, businesses, and property owners. That agreement provided, inter alia, that the District would continue to fund its operations according to the apportionment scheme established under New York's

---

takings claims to the district court for resolution, we need not evaluate the differences between the old and new assessment schemes.

Environmental Conservation Law, and that the District had a continuing "statutory right" under New York law "to implement changes to its benefits assessments through appropriate [] District procedures, which procedures are to be outside the jurisdiction of any new licenses for the subject projects." In addition, the agreement specified that the District had "initiated a reassessment procedure under Article 15, Title 21 of the New York State Environmental Conservation Law for the Hudson River," and that it would "publish a public notice of this reassessment procedure" and "make a good faith effort to complete the reassessment procedure in an expeditious manner, by June 30, 2000, or by the adoption of the next three-year budget, whichever first occurs." In 2009, the District finally undertook a reapportionment.

In 2002, FERC issued a license to the District for the dam and reservoir at the GSL Project ("the project dam and reservoir components (Conklingville Dam and Great Sacandaga Lake) of a unit of hydropower development that also includes a powerhouse and generating facilities"). On the same day, FERC issued licenses to a hydropower company for four hydroelectric projects downstream from the GSL Project, on the Sacandaga and Hudson rivers.

### 2. The District's Permitting System

In addition to its assessment and apportionment functions, the District regulates some of the land around the Great Sacandaga Lake, including by issuing access permits to nearby residents, businesses, and other groups for certain exclusive-access areas near the lake. The District charges fees for these permits. The District's Hudson River Area

Budget is funded by revenues from these permits, annual assessments charged to statutory beneficiaries such as National Grid, and revenues from a hydroelectric site agreement with hydropower company Erie Boulevard Hydropower, L.P., for use of head and water rights at the Conklingville Dam.

B. Plaintiff-Appellant

National Grid is in the business of transmitting and distributing energy to customers in the Northeast. Until 1999, it owned and operated power-generation facilities, including seventy-two hydroelectric power stations in New York. The company has since sold off those hydroelectric-generating stations, although it still owns several parcels of vacant land within the District's boundaries that were assessed by the District for headwater benefits from the GSL Project (the "Subject Parcels"). Until at least 2009, the District assessed the Subject Parcels according to the original 1925 apportionment method described above, even though National Grid was no longer in the business of generating hydroelectric power. The Subject Parcels are currently vacant and undeveloped, and, according to National Grid, "are not hydroelectric generating properties, are not developable as such, and are not FERC licensed to be hydroelectric properties." The District assesses the Subject Parcels under N.Y. Envtl. Conserv. L. § 15-2103 based on their potential to utilize the headwater benefits.

1. State-Court Actions

Over the past decade, National Grid has brought twenty separate Article 78 proceedings in three different New York state trial courts to challenge the District's annual assessments of National Grid's parcels in the Hudson River and Black River watersheds. In those actions, National Grid has alleged equal protection and takings claims under the New York and federal constitutions. In another suit brought in state court, National Grid alleged that the District breached the Offer of Settlement between the District and the federal government by failing to conduct an appropriate reapportionment by the Offer of Settlement's deadline.

As discussed below, these state-court proceedings are still pending. In June 2008, National Grid moved in Hamilton County Supreme Court to consolidate them into a single action; the District opposed that motion, and, according to National Grid, the state court has yet to rule on it.[2] In addition, National Grid alleges that some of its discovery motions also remain pending in the state court proceedings.

2. The *Albany Engineering* Case

In 2006, Albany Engineering Corporation, a FERC licensee that owned and operated a hydroelectric project downstream from the GSL Project, and that was subject to assessments by the District, filed an administrative complaint with FERC. Albany Engineering argued that the District and other New York State agencies lacked authority

---

[2] When the present appeal was argued, that consolidation motion remained pending in state court, and so far as we know it remains pending today.

9

under New York law to assess it for downstream benefits that the company received from the dam. The company asserted, inter alia, that section 10(f) of the FPA, 16 U.S.C. § 803(f), preempted the District's headwater-benefits assessment method, and prevented New York from mandating compensation for costs other than those associated with "interest, maintenance, and depreciation" of its hydropower project.

FERC rejected that argument, concluding that section 10(f) did not preempt the District's authority to "recover[] all of the costs of operating and administering a storage project that affects a variety of downstream uses within that state." Fourth Branch Assocs. (Mechanicville) v. Hudson River-Black River Regulating Dist., 117 FERC 61,321 ¶ 50 (2006). However, FERC also concluded that "assessments for interest, maintenance, and depreciation in respect to the Great Sacandaga Lake Project cannot be implemented solely pursuant to New York law but rather are subject to approval by [FERC]," and that "any headwater benefits determination made or approved by [FERC] . . . would have to encompass all of the hydropower projects that receive headwater benefits from the Great Sacandaga Lake Project." Id. ¶ 51; see also id. ¶ 54. But any such determination, according to FERC,

> would not include other entities that receive actual or potential energy benefits, such as mills and undeveloped parcels, or flood control benefits, such as municipalities, since [FERC has] no jurisdiction over charges assessed to entities other than hydropower project owners. The District is free to determine payments owing from these non-hydropower entities for any of its expenses, as well as payments from any beneficiaries, hydropower or otherwise, for operating expenses and any other items which are authorized under

10

> New York law and for which the Commission has no authority under section 10(f) to require licensees to reimburse upstream owners.

Id. ¶ 51.

On appeal, the U.S. Court of Appeals for the District of Columbia Circuit held that section 10(f) "must, in order to accomplish the full objectives of Congress, be understood to preempt all state orders of assessment for headwater benefits," and that FERC's interpretation of the statute was therefore "unreasonable." Albany Eng'g Corp. v. FERC, 548 F.3d 1071, 1073 (D.C. Cir. 2008). The court remanded the case to FERC "to consider appropriate remedies consistent with [its] holding." Id. Notably, the court pointed out that "[o]f course" the FPA does not "preclude[] every state exercise of power marginally related to federal hydropower licensees," and that the legislative history of the FPA makes clear that Congress intended for the statute to preempt states' "dual licensing authority" and regulation of "hydropower projects." Id. at 1075-76.

### 3. The Present Suit

Apparently inspired by the D.C. Circuit's Albany Engineering decision, in 2009 National Grid filed the present action in the Northern District of New York, seeking "judicial review, nullification, determination and/or declaratory judgment" that, inter alia, the District's annual assessment scheme is "illegal, null and void, as against [National Grid's] parcels," and "[t]hat the regulation of the subject navigable waters within the District's boundaries are wholly pre-empted by the [FPA], and thereby, any assessments by the District must be limited to the regulation of irrigation and municipal purposes." Am. Compl. ¶ 1.

11

National Grid asserted five causes of action, each seeking a declaratory judgment. National Grid asked the Court to declare:

(1) That the FPA "pre-empt[s] the regulation of navigable waterways for all purposes" other than "the regulation of irrigation and municipal uses," and that, because National Grid's Subject Parcels "are *not* used for irrigation or municipal uses," they may not "be subject to the District's assessments for any purpose." Id. ¶¶ 93-101.

(2) That under section 10(f) of the FPA, "the District can only assess for 'interest, maintenance and depreciation,'" Am. Compl. ¶ 104 (quoting 16 U.S.C. § 803(f)), and that because "the District treats National Grid's Parcels as hydroelectric sites, its assessments must be determined under [section] 10(f), or not at all," id. ¶ 108.

(3) That the District's assessment scheme violates National Grid's equal protection rights under the Fifth and Fourteenth Amendments of the U.S. Constitution, because "[t]he District's failure to limit its assessments to parcels benefited by irrigation and municipal uses (as required by the FPA) results in National Grid's Parcels being treated differently from other similarly situated parcels," id. ¶ 115, or, alternatively, because "even if . . . the District could assess National Grid's Parcels for purposes other than irrigation and municipal uses, the District's failure to apportion its operation costs over all benefited parcels necessitates the finding that National Grid's Parcels are being treated differently from other similarly situated benefited parcels," id. ¶ 116.

(4) That the District's permitting system "fails to incorporate, reference or set forth the specific findings and prescriptions of the FERC License and, thus, are contrary thereto and without authority thereunder," that the permitting system "results in the inclusion of

12

[the District's] administrative costs in the Annual Assessments against the Hydroelectric Sites," and that the "assessments are preempted by [the] FPA, and thereby illegal." Id. ¶¶ 120-21.

(5) That the District's assessment scheme "does and will result in the taking of Plaintiff's Parcels for public use without rendering just compensation therefor in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States, and Sections 6 and 11 of Article I of the Constitution of the State of New York." Id. ¶ 125.

In addition to its requests for these declaratory judgments, National Grid sought an award against the District and the DEC "in the amount of $5,000,000, or as otherwise determined by" the district court, as compensation for the assessments it had paid, along with "such other and further relief as the Court deems appropriate, including the costs, disbursements and attorneys' fees of this proceeding." Id. at 23-24.

C. Intervenor-Appellee

The Sacandaga Protection Corporation (the "SPC") is a nonprofit organization formed in 2009 to "promote the interests of the community surrounding Great Sacandaga Lake," and particularly to "protect and preserve" the existing system of permits for certain activities at the lake. Its constituents include permit holders, many of whom allegedly "have made costly improvements to permit access areas, maintain the access areas, and rely on the permits for stable property values." In the district court proceedings described below, SPC moved to intervene, and the district court granted the

13

motion, concluding "that National Grid and SPC had sufficiently divergent interests in this is case to warrant intervention as of right."[3]

## II. **The District Court's Decisions**

After National Grid filed its original complaint, the DEC moved under Federal Rule of Civil Procedure 12(b)(6) to be dismissed from the case. Concluding that the complaint failed to allege sufficient facts to show that the DEC's actions (or inaction) caused the injuries of which National Grid complained, the district court granted the DEC's motion and dismissed the DEC from this action. See Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., No. 5:09-CV-00471, 2009 WL 3030146, at *7 (N.D.N.Y. Sept. 16, 2009).

Thereafter, National Grid filed an amended complaint, and the District moved for summary judgment on all claims. The district court granted the motion as to National Grid's federal preemption claims, but dismissed National Grid's remaining constitutional claims on abstention grounds. Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., No. 5:09-CV-00471, 2010 WL 3909864, at *5-8 (N.D.N.Y. Sept. 30, 2010).

In rejecting National Grid's preemption argument, the district court held that because National Grid (unlike the plaintiff in Albany Engineering) was not a FERC licensee, and because the Subject Parcels were not hydropower projects (again, unlike the

---

[3] The New York Supreme Court, Hamilton County (Aulisi, *J.*) has denied the SPC's motion to intervene. That particular state-court action concerns only Niagara Mohawk's challenge to the 2008 assessments.

situation in Albany Engineering), the FPA did not preempt or in any way limit the District's authority to assess the parcels.  But the district court nevertheless noted its displeasure with the assessment scheme in use at the time:

> It seems obvious that in the over eighty years since the District first began assessing properties along the Hudson and Black Rivers that other property owners, including both commercial and residential parcels, are now enjoying the benefit of the District's efforts to maintain the Conklingville Dam, which in turn contains the Great Sacandaga Lake where countless residential homeowners now own and maintain lakefront property.  However, the District has steadfastly refused to undertake reassessment or reapportionment despite having commissioned at least one consulting firm to perform a regulation study which revealed that there are several categories of economically determinable benefits which could or should be apportioned in the District's budget but which are not currently included.  By all accounts, it appears to the Court that the District agrees that a reapportionment should and must be done since it signed an Offer of Settlement before FERC in 2002 that included a provision requiring that a reapportionment be completed.

Id. at *5 (emphasis omitted).  "Nevertheless," the district court concluded, "in spite of the egregious circumstances of National Grid's continuing obligation to pay millions of dollars in assessments to the District," the FPA does not preempt the District's assessment scheme, and "nothing" in the D.C. Circuit's Albany Engineering decision "held that the District . . . is prohibited from collecting assessments under state law from property owners along the Hudson River and Great Sacandaga Lake, even if these waterways are otherwise regulated by federal law and FERC for other purposes."  Id.  Because National Grid did not claim to be "a licensed or unlicensed hydroelectric power producer," the district court concluded that its FPA preemption arguments must fail as a matter of law.

15

Id. Accordingly, the court dismissed National Grid's preemption claims – the first, second, and fourth causes of action in the amended complaint. Id. at *6.

The district court abstained from exercising jurisdiction over National Grid's remaining constitutional claims – the third and fifth causes of action in the amended complaint – because (1) they were simultaneously being litigated in twenty previously filed, still-pending state-court actions, thus presenting the risk of "piecemeal litigation"; (2) the present case involved matters "of peculiar interest to New York," namely "how the District – a New York public benefit corporation – should resolve operation of its outdated apportionment scheme under a New York State statute"; and (3) National Grid had submitted no evidence to show "that the state courts have not or will not adequately protect its rights in any of" the pending state-court proceedings. Id. at *6-7. The district court therefore concluded that abstention was proper under the multifactor "exceptional circumstances" test established in Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976), and further developed in Moses H. Cone Mem'l Hospital v. Mercury Construction Corp., 460 U.S. 1 (1983). See Niagara Mohawk, 2010 WL 3909864, at *7.

The district court also concluded, in the alternative, that abstention was justified under the more discretionary standard for abstention in declaratory judgment actions established by Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995) ("Distinct features of the Declaratory Judgment Act, we believe, justify a standard vesting district courts with greater discretion in declaratory judgment actions than that permitted under the 'exceptional circumstances' test of Colorado River and Moses H. Cone."). Under this

16

test, the district court concluded, "abstention is also warranted due to the indisputable existence of concurrent identical state court litigation." Niagara Mohawk, 2010 WL 3909864, at *7.

On appeal, National Grid argues that the district court erred in holding that the FPA does not preempt the District's assessment scheme, and in abstaining from deciding National Grid's remaining constitutional claims. Additionally, National Grid summarily asserts that the district court erred in dismissing its claims against the DEC. See Appellant's Br. 3; id. at 12 n.2. However, as discussed below, we conclude that these brief and conclusory assertions do not suffice to present the latter argument for our review.

## DISCUSSION

## I. Federal Preemption

We review a district court's grant of summary judgment de novo and its factual findings for clear error. See Bessemer Trust Co. v. Branin, 618 F.3d 76, 85 (2d Cir. 2010). We will affirm the district court's grant of summary judgment if the movant has "show[n] entitlement to judgment as a matter of law and the absence of any issue of material fact." Emslie v. Borg-Warner Auto., Inc., 655 F.3d 123, 125 (2d Cir. 2011); see Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law," and an issue of fact is "genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Bessemer Trust, 618 F.3d at 85 (internal quotation marks and brackets omitted). We likewise review de novo "a district court's application of preemption principles." N.Y. SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 103 (2d Cir. 2010).

17

National Grid argues that the FPA "wholly pre-empted regulation of navigable waterways in the United States, except with respect to State regulation of irrigation or municipal uses" or, in the alternative, "all matters regarding navigable waterways," and that, because the District is a FERC licensee, the FPA limits the District's "assessments for matters other than irrigation and municipal purposes . . . to 'headwater benefit assessments, as determined by FERC.'"  Because the FPA does not contain express preemption language, and because the District's actions fall within the powers traditionally exercised by states, we begin with a strong presumption against finding that the District's powers are federally preempted, see Clarkstown, 612 F.3d at 104 – a presumption that National Grid fails to overcome.

A.  Overview

Our "Constitution establishes a system of dual sovereignty between the States and the Federal Government" designed to "reduce the risk of tyranny and abuse from either front."  Gregory v. Ashcroft, 501 U.S. 452, 457-58 (1991).  The states' power under this system is "concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause."  Tafflin v. Levitt, 493 U.S. 455, 458 (1990).  The Supremacy Clause provides that the "Constitution, and Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Under the doctrine of federal preemption, "state laws that conflict with federal law are without effect."  Altria Grp. Inc. v. Good, 555 U.S. 70, 76 (2008) (internal quotation marks omitted).

"The key to the preemption inquiry is the intent of Congress," and "Congress may manifest its intent to preempt state or local law explicitly, through the express language of a federal statute, or implicitly, through the scope, structure, and purpose of the federal law." Clarkstown, 612 F.3d at 104.  Thus, preemption "may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose."  Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95 (1983) (internal quotation marks omitted).

The FPA does not contain an express preemption clause.  Accordingly, we must determine whether it implicitly preempts the District's powers.  Courts have recognized two types of implied preemption: (1) field preemption, where Congress has manifested an intent to "occupy the field" in a certain area, as evidenced by "a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject"; and (2) conflict preemption, where state law "actually conflicts with federal law," including where "it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990) (internal quotation marks, brackets, ellipsis, and citations omitted).  These two categories of implied federal preemption – field and conflict – "are not rigidly distinct."  Goodspeed Airport LLC v. East Haddam Inland Wetlands & Watercourses Comm'n, 634 F.3d 206, 209 n.4 (2d Cir. 2011).

Under all of these three preemption tests – express, field, and conflict – our task is to determine whether, and to what extent, Congress intended to preempt state law. <u>See</u> <u>Cippollone v. Liggett Grp., Inc.</u>, 505 U.S. 504, 516 (1992) ("[T]he purpose of Congress is the ultimate touchstone of pre-emption analysis." (internal quotation marks omitted)). We begin "with the assumption that the historic police powers of the States are not to be superseded" by federal law "unless that is the clear and manifest purpose of Congress." <u>Id</u>. (internal quotation marks and brackets omitted). Similarly, we must "give full effect to evidence that Congress considered, and sought to preserve, the States' coordinate regulatory role in our federal scheme." <u>California v. FERC</u>, 495 U.S. 490, 497 (1990).

Our independent review of the FPA's text, structure, and history reveals no evidence that Congress intended to curb the authority of states to regulate and assess non-licensed, non-hydropower-project properties such as National Grid's vacant parcels – an authority that falls within the states' traditional powers. The relevant sections of the FPA govern the relationships between multiple FERC licensees, and between FERC licensees and non-licensed hydropower projects. But they say nothing explicitly about the ability of one FERC licensee, such as the District, to assess a non-licensee that is not engaged in the production of power. Nor does the FPA implicitly preempt the District's powers to assess non-licensee, non-hydropower properties; far from "occupying" this field, the FPA avoids it altogether and leaves this type of assessment to state authorities like the District. Finally, we find no clash or friction between the FPA and New York state law that would limit the District's assessment authority under a "conflict" theory of preemption.

National Grid argues that the FPA constitutes "a comprehensive statutory scheme to regulate navigable waterways and occupy the field," that the FPA evidences a

congressional determination "that [FERC-]licensed project operators could only assess downstream projects," and that "Congress did not permit or authorize FERC licensees to collect assessments from any other source, including undeveloped vacant lands."  But the text, history, and caselaw of the FPA make clear that to the extent the statute preempts state law, it preempts only those laws that affect the federal regulation of hydroelectric projects.

Section 10(f) of the FPA provides, inter alia:

> That whenever any *licensee hereunder* is directly benefited by the construction work of another licensee, a permittee, or of the United States of a storage reservoir or other headwater improvement, [FERC] shall require *as a condition of the license* that the *licensee* so benefited shall reimburse the owner of such reservoir or other improvements for such part of the annual charges for interest, maintenance, and depreciation thereon as the Commission may deem equitable. . . .

> Whenever *any power project* not under license is benefited by the construction work of a licensee or permittee, the United States or any agency thereof, [FERC] . . . shall determine and fix a reasonable and equitable annual charge to be paid to the licensee or permittee on account of such benefits, or to the United States if it be the owner of such headwater improvement.

16 U.S.C. § 803(f) (emphasis added).  Rather than occupying the entire field of all regulation related to navigable waterways, as National Grid suggests, section 10(f) focuses on the relationships between multiple FERC licencees, and between FERC licensees and non-licensee power projects.  The provision requires FERC to ensure that downstream licensees pay their fair share for benefits received for improvements made by upstream licensees, and that the costs of such improvements are equitably shared between licensed and unlicensed power projects.  It does not vest FERC with authority to assess

21

other types of downstream landowners for non-power-related benefits resulting from licensees' activities. Nor does it limit the authority of the states to assess, or to permit a FERC-licensed, state-created authority to assess, such downstream, non-power-producing beneficiaries. Section 10(f) therefore does not preempt the District's authority under state law to assess National Grid for benefits to its undeveloped properties.

National Grid's reliance on section 27 of the FPA, 16 U.S.C. § 821, is similarly misguided. That section, the Act's savings clause, provides:

> Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.

National Grid contends that because this clause saves only those state laws "relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses," id., the District may assess National Grid only for those benefits related to irrigation or municipal uses. Again, however, National Grid misapplies the preemption test. The fact that Congress chose to make explicit that it was not preempting states' irrigation- and municipal-use-related assessments does not establish that Congress therefore intended to preempt absolutely everything else. In other words, just because the savings clause fails to mention certain state-law powers does not mean that all unmentioned powers are federally preempted.

National Grid suggests that any state action not expressly *authorized* by the FPA is necessarily *prohibited* by it because Congress intended for the FPA to occupy the entire field of water control. Had Congress evidenced such an intent, or included in the FPA

22

some mechanism for FERC's assessment of non-FERC-licensed entities that operated no hydropower projects, then National Grid might plausibly be able to argue that the FPA preempts similar state-law assessment schemes. But here, National Grid argues that by not expressly authorizing in the FPA something to which the statute does not apply in the first place – that is, assessment of non-licensed, non-hydropower-project properties, or even regulation of "navigable waterways" generally – Congress intended to bar states from exercising those powers under any circumstances. We see no reason to conclude that the FPA has occupied this field. Again, nothing in the text or history of the FPA, or in the caselaw interpreting the statute, supports this strained argument. The FPA does not affect in any way the power of a state agency, acting under state law, to assess vacant parcels of land that are not licensed by FERC and are not hydropower projects. Accordingly, we cannot infer from the language of sections 27 or 10(f) that the FPA has a preemptive effect on the District's assessment authority at issue here.

As the Supreme Court recognized more than half a century ago, the FPA, "read in the light of its long and colorful legislative history," reveals

> both a vigorous determination of Congress to make progress with the development of the long idle water power resources of the nation and a determination to avoid unconstitutional invasion of the jurisdiction of states. The solution reached is to apply the principle of the division of constitutional powers between the state and Federal Governments. This has resulted in a dual system involving the close integration of these powers rather than a dual system of futile duplication of two authorities over the same subject matter.

First Iowa Hydro-Elec. Coop. v. FERC, 328 U.S. 152, 171 (1946). In the present case, the District's assessment powers over vacant, non-licensee, non-hydropower plots of land does not overlap FERC's powers in any way. Thus, while the FPA does indeed preempt

23

some state and local laws, its scope is far narrower than National Grid suggests, and does not affect the District's challenged assessments.

National Grid, perhaps recognizing that the text and legislative history of the FPA do not help its cause, cites to several out-of-circuit and Supreme Court cases for the proposition that under the FPA, "FERC has sole regulatory authority over the areas purported to be regulated by" the District (and in fact "over the [District's] reason for existing"), with the exception of "the limited irrigation and municipal use purposes" described in section 27 of the Act. Again and again, however, National Grid mischaracterizes the holdings of those cases.

For example, National Grid cites First Iowa, 328 U.S. 152, in support of its assertion that "the FPA has been found to totally occupy the field preempting all state and local laws concerning the regulation of navigable waterways for any purpose" apart from "the regulation of irrigation and municipal purpose uses." Appellant's Br. 28. First Iowa says nothing of the sort. The very first line of the opinion reads: "This case illustrates the integration of federal and state jurisdictions in *licensing water power projects* under the Federal Power Act." First Iowa, 328 U.S. at 156 (emphasis added). Indeed, the case concerns the interaction between state and federal permitting requirements for a hydropower project and how compliance with state hydropower-project licensing requirements may "conflict with federal requirements" and thus potentially "block the federal license." See id. at 166-67.

The Supreme Court recognized in First Iowa that the FPA "was distinctly an effort to provide federal control over and give federal encouragement to *water power development*." Id. at 180 n.23 (emphasis added). The case concerned a hydroelectric

24

project that, unlike National Grid's vacant parcels of land, was "clearly within the jurisdiction of [FERC] under the Federal Power Act." Id. at 163. And although the Court described the FPA as an "enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation," id. at 180, the context of the controversy makes clear that the "water resources" in question are hydroelectric power resources. Nothing in the opinion suggests that Congress intended to federalize anything more than the licensing of hydropower projects; the opinion does not indicate that the FPA, as National Grid contends, renders state actors powerless to engage in other forms of regulation of navigable waters, including assessing vacant, non-FERC-licensed, non-hydropower parcels within their jurisdiction for benefits from water-control projects not related to power production.

On the contrary, the Court noted that the FPA recognizes "a separation of those subjects which remain under the jurisdiction of the states from those subjects which the Constitution delegates to the United States and over which Congress vests the Federal Power Commission [FERC's predecessor] with authority to act":

> To the extent of this separation, the Act establishes a dual system of control. The duality of control consists merely of the division of the common enterprise between two cooperating agencies of Government, each with final authority in its own jurisdiction. The duality does not require two agencies to share in the final decision of the same issue. Where the Federal Government supersedes the state government there is no suggestion that the two agencies both shall have final authority. In fact a contrary policy is indicated . . . .

Id. at 167-68 (footnotes omitted). In other words, the FPA does not supplant the hydropower-licensing powers of state actors except in those areas where state and federal

25

agencies both attempt to make a final decision on "the same issue" – that is, where a state-federal conflict arises.

National Grid similarly mischaracterizes the holding of California v. FERC, 495 U.S. 490 (1990), which it cites for the same proposition as First Iowa – that the FPA occupies the field and preempts "all state and local laws concerning the regulation of navigable waterways" other than those related to "the regulation of irrigation and municipal purpose uses." Appellant's Br. 28. But far from holding that the FPA preempts from state control all regulatory power over water issues by occupying the entire field, the Supreme Court specifically held that preemption under the FPA applies only when a state measure "actually conflicts with federal law" or "the state law stands as an obstacle to the congressional objectives." California v. FERC, 495 U.S. at 506 (internal quotation marks omitted). Neither of these conflict factors exists in the present case. The Court in California v. FERC also made clear that the FPA leaves intact countless state powers, not just the hydropower-related ones specifically "saved" by section 27. See id. at 496-96.[4]

---

[4] Other cases cited by National Grid are similarly inapposite, in addition to being nonbinding on our Court. The cases deal on their facts with power issues, or with the limits of FERC's authority, and are wholly distinguishable from the present case. See, e.g., Coal. for Fair & Equitable Regulation of Docks on Lake of the Ozarks v. FERC, 297 F.3d 771, 774 (8th Cir. 2002) (lakefront property owners challenged FERC's power to delegate authority to a state agency for collection of user fees at the lake's docks, where the lake was "part of a hydropower project . . . owned and operated by" a power company, "under a license from FERC that authorize[d]" the company "to allow certain uses of the Lake for the benefit of the public and to recoup its costs of doing so, subject to oversight by FERC"); Sayles Hydro Assocs. v. Maughan, 985 F.2d 451, 453 (9th Cir. 1993) (operators of a FERC-licensed hydroelectric power project challenged the California State Water Resources Control Board's authority to require them to obtain a state permit for operation of the project); Pub. Serv. Co. of Colo. v. FERC, 754 F.2d 1555, 1557 (10th Cir. 1985) (state utility challenged the authority of FERC to assess it "for headwater benefits received at [the utility's] Shoshone

For these reasons, we conclude that the FPA does not preempt the District's authority under New York law to assess vacant, non-FERC-licensed, non-hydropower-producing properties within its jurisdiction, such as the Subject Parcels. We therefore affirm the district court's judgment as to federal preemption.

## II. **Abstention**

We review a district court's abstention decision for abuse of discretion. "A district court abuses its discretion if it bases its ruling on a mistaken application of the law or a clearly erroneous finding of fact." Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001). Abuse of discretion is normally a deferential standard, but in the abstention context our review is "somewhat rigorous":

> In abstention cases, . . . because we are considering an exception to a court's normal duty to adjudicate a controversy properly before it, the district court's discretion must be exercised within the narrow and specific limits prescribed by the particular abstention doctrine involved. Thus, there is little or no discretion to abstain in a case which does not meet traditional abstention requirements.

Dittmer v. Cnty. of Suffolk, 146 F.3d 113, 116 (2d Cir. 1998) (internal quotation marks and brackets omitted). "Further, the presence of a federal basis for jurisdiction may raise the level of justification needed for abstention," and "our appellate inquiry is especially rigorous in this context." Planned Parenthood of Dutchess-Ulster, Inc. v. Steinhaus, 60 F.3d 122, 126 (2d Cir. 1995) (internal quotation marks omitted). We conclude that the district court abused its discretion by dismissing National Grid's remaining constitutional claims under the doctrine of abstention, and that the court's decision to abstain cannot be

---

Hydroelectric Plant from the United States' Green Mountain Reservoir").

supported under the abstention doctrine "in any of its forms."  See Colorado River Water

Conservation Dist. v. United States, 424 U.S. 800, 813 (1976).

Like preemption, abstention is generally disfavored, and federal courts have a

"virtually unflagging obligation" to exercise their jurisdiction.  See id. at 817.  "The

abstention doctrine comprises a few extraordinary and narrow exceptions to a federal

court's duty to exercise its jurisdiction," and "[i]n this analysis, the balance is heavily

weighted in favor of the exercise of jurisdiction."  Woodford v. Cmty. Action Agency of

Greene Cnty., Inc., 239 F.3d 517, 522 (2d Cir. 2001) (internal quotation marks and

brackets omitted).  As the Supreme Court has instructed:

> Abstention from the exercise of federal jurisdiction is the
> exception, not the rule.  The doctrine of abstention, under
> which a District Court may decline to exercise or postpone the
> exercise of its jurisdiction, is an extraordinary and narrow
> exception to the duty of a District Court to adjudicate a
> controversy properly before it.  Abdication of the obligation
> to decide cases can be justified under this doctrine only in the
> exceptional circumstances where the order to the parties to
> repair to the state court would clearly serve an important
> countervailing interest.  It was never a doctrine of equity that
> a federal court should exercise its judicial discretion to
> dismiss a suit merely because a State court could entertain it.

Colorado River, 424 U.S. at 813-14 (internal quotation marks, brackets, and citations

omitted).  In the present case, the district court found that abstention was appropriate

under two different abstention doctrines.  We discuss each in turn.

A. *Colorado River* Abstention

In Colorado River, the Supreme Court held that, in addition to the earlier-

established categories of abstention,[5] in certain other "exceptional circumstances," id. at

813, a federal court may abstain from exercising jurisdiction when parallel state-court

litigation could result in "comprehensive disposition of litigation" and abstention would

conserve judicial resources, id. at 817-18. "Suits are parallel when substantially the same

parties are contemporaneously litigating substantially the same issue in another forum."

Dittmer, 146 F.3d at 118, quoting Day v. Union Mines Inc., 862 F.2d 652, 655 (7th Cir.

1988) (internal quotation marks omitted).

In evaluating whether Colorado River abstention is appropriate, federal district

courts are to consider six factors, "with the balance heavily weighted in favor of the

exercise of jurisdiction," Moses H. Cone, 460 U.S. at 16:

> (1) whether the controversy involves a res over which one of
> the courts has assumed jurisdiction; (2) whether the federal
> forum is less inconvenient than the other for the parties; (3)
> whether staying or dismissing the federal action will avoid
> piecemeal litigation; (4) the order in which the actions were
> filed, and whether proceedings have advanced more in one
> forum than in the other; (5) whether federal law provides the
> rule of decision; and (6) whether the state procedures are
> adequate to protect the plaintiff's federal rights.

Woodford, 239 F.3d at 522. The Supreme Court has explained that none of these factors

alone "is necessarily determinative," but, instead, "a carefully considered judgment taking

into account both the obligation to exercise jurisdiction and the combination of factors

---

[5]  See, e.g., Younger v. Harris, 401 U.S. 37, 43-57 (1971) (requiring that, absent bad faith, fraud, or irreparable harm, a district court abstain from enjoining ongoing state criminal proceedings); Burford v. Sun Oil Co., 319 U.S. 315, 317-34 (1943) (permitting federal courts sitting in diversity jurisdiction to relinquish jurisdiction where a case involves complicated issues of state law); R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 498 (1941) (requiring abstention where unsettled and complex state-law questions must be decided before federal constitutional question can be resolved).

counselling against that exercise is required. Only the clearest of justifications will warrant dismissal." Colorado River, 424 U.S. at 818-19 (citation omitted); see also Moses H. Cone, 460 U.S. at 16 (noting that the "weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case").

Where a Colorado River factor is facially neutral, that "is a basis for retaining jurisdiction, not for yielding it." Woodford, 239 F.3d at 522. In evaluating abstention decisions like the present one, "our task . . . is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under Colorado River to justify the surrender of that jurisdiction." Moses H. Cone, 460 U.S. at 25-26.

Applying the six factors, we conclude that the district court's dismissal of National Grid's remaining constitutional claims on Colorado River abstention grounds constituted an abuse of its discretion.

First, we consider whether the federal or state court has obtained jurisdiction over a res. See Colorado River, 424 U.S. at 818. This is not an in rem action, and neither the federal district court nor the New York state courts have assumed jurisdiction over any res or property. As the district court correctly noted, "[t]here is no property or res at issue" here. This factor therefore weighs against abstention. See De Cisneros v. Younger, 871 F.2d 305, 307 (2d Cir. 1989) (noting that "the absence of jurisdiction over a *res* . . . point[s] toward exercise of federal jurisdiction").

Second, we evaluate whether the federal forum is less inconvenient than the state forum for the parties. Here, the fora appear to be equally convenient, as both parties and

30

both fora are located in northern New York State.  Indeed, no party raises any serious challenge to the convenience of the federal forum, and the district court concluded that "the federal forum is not inconvenient."  Niagara Mohawk, 2010 WL 3909864, at *7. This factor too therefore militates against abstention.  See Vill. of Westfield v. Welch's, 170 F.3d 116, 122 (2d Cir. 1999) ("[W]here the federal court is just as convenient as the state court, that factor favors retention of the case in federal court." (internal quotation marks omitted)).

Third, we evaluate whether abstention by the federal court will avoid "piecemeal litigation."  See Colorado River, 424 U.S. at 818.  The district court called this factor "the paramount consideration in this case."  Niagara Mohawk, 2010 WL 3909864, at *7. Although avoidance of piecemeal litigation is indeed an important value, and although the parallel state and federal proceedings here present some risks that the district court correctly identified, the court erred in concluding that this factor outweighed the other Colorado River factors that militated against abstention.  As we have explained,

> the primary context in which we have affirmed Colorado River abstention in order to avoid piecemeal adjudication has involved lawsuits that posed a risk of inconsistent outcomes not preventable by principles of res judicata and collateral estoppel.  The classic example arises where all of the potentially liable defendants are parties in one lawsuit, but in the other lawsuit, one defendant seeks a declaration of nonliability and the other potentially liable defendants are not parties.

Woodford, 239 F.3d at 524.

This case does not present such a risk of inconsistency.  Indeed, the DEC and the District are both named in the state-court actions and in the federal suit, and the risk of "inconsistent outcomes" seems slim: National Grid's constitutional claims are

31

straightforward, and the New York state courts appear unlikely to decide them anytime soon.  Furthermore, the twenty separate state actions in three different New York counties are already in some sense "piecemeal"; the single federal case, by contrast, would go to the heart of all the issues in these cases.  Arguably, therefore, this Colorado River factor might even cut against abstention.  In any event, this factor certainly does not weigh nearly as strongly in favor of abstention as the district court believed.

Fourth, we consider the order in which jurisdiction was obtained.  The district court noted that "primary jurisdiction has clearly been long obtained in state court" on National Grid's remaining constitutional claims.  Niagara Mohawk, 2010 WL 3909864, at *7.  But this prong of the Colorado River test turns not just "on the sequence in which the cases were filed, 'but rather in terms of how much progress has been made in the two actions.'"  Vill. of Westfield, 170 F.3d at 122, quoting Moses H. Cone, 460 U.S. at 21.  Even where, as here, a state action was commenced before the federal suit, that factor will carry "little weight" if "there has been limited progress in [the] state court suit."  See Vill. of Westfield, 170 F.3d at 122 (internal quotation marks omitted).  Although National Grid's twenty state-court actions were filed before the present federal suit, New York courts have made little headway over the past decade in deciding those actions.  The record on appeal is unclear as to the exact status of the state-court actions, but none of them has been resolved or appears close to disposition.  Even the decision whether to consolidate the actions into one has remained pending for more than three years.

Whatever the cause of these delays, it cannot be said that the order in which the federal court obtained its jurisdiction should weigh heavily in favor of abstention in this case.  Here, as in Moses H. Cone, it can reasonably be argued that "the federal suit was

running well ahead of the state suit at the very time that the District Court decided to refuse to adjudicate the case." 460 U.S. at 22. At best, we regard the filing of the state actions before the federal action as neutral – and, again, under Colorado River, a neutral factor counsels against abstention.

Fifth, we look at what law – state, federal, or foreign – provides the rule of decision in the case. See Moses H. Cone, 460 U.S. at 23. "When the applicable substantive law is federal, abstention is disfavored," and, indeed, even "the *absence* of federal issues does not strongly advise dismissal, unless the state law issues are novel or particularly complex." Vill. of Westfield, 170 F.3d at 123-24 (internal quotation marks omitted) (emphasis added).

As the district court recognized, National Grid's remaining constitutional claims arise under both the federal and New York constitutions. See Niagara Mohawk, 2010 WL 3909864, at *7. However, National Grid's state constitutional claim – that the District's assessments of National Grid constitute unconstitutional takings under the New York State Constitution – does not appear particularly novel or complex. Indeed, it mirrors National Grid's federal takings claim. Moreover, we disagree with the district court that abstention was appropriate because "it is of peculiar interest to New York how the District – a New York public benefit corporation – should resolve operation and management of its outdated apportionment scheme under a New York State statute." Id. That issue is no more "peculiar" or provincial than the sorts of issues federal courts are regularly called upon to decide.

In fact, the district court would not be required to decide that issue – "how the District . . . should resolve operation and management" of its apportionment scheme – in

33

order to resolve National Grid's constitutional claims. Rather, a decision on those claims would determine only whether the District's assessment scheme, as it existed until the recent reapportionment, violated National Grid's rights under the federal and state constitutions. The relief requested by National Grid does not ask the court to redesign the assessment scheme or provide advice to the state. Rather, National Grid seeks (1) a declaration that the system that existed until the recent reapportionment was unconstitutional and (2) a damages award that "refund[s]" the company for the assessments it paid to the District prior to 2010. See Am. Compl. 24.

In any event, the Supreme Court has directed that "[a]lthough in some rare circumstances the presence of state-law issues may weigh in favor of" a federal court's surrender of its jurisdiction, "the presence of federal-law issues must always be a major consideration weighing against surrender." Moses H. Cone, 460 U.S. at 942. Here, federal issues not only are present, but predominate.[6] Accordingly, the district court erred in concluding that this factor supported abstention.

Sixth and finally, we consider whether the procedures of New York's state courts "are adequate to protect [National Grid's] federal rights." See Woodford, 239 F.3d at 522. Specifically, we are to determine whether "the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." Moses H. Cone, 460 U.S. at 28. We do not doubt that the New York courts provide a fair alternative forum that is capable of resolving the constitutional issues. On

---

[6] Unlike the federal complaint, the state proceedings also include federal Commerce Clause claims. Assuming that such claims are not time-barred, we see no reason that National Grid should not be permitted to amend its federal complaint to include such claims in lieu of litigating them separately in state court.

34

the record before us, however, it appears that the pace of the parallel litigation in New York state court has not adequately protected National Grid's federal rights and has offered no prospect of a "complete and prompt" resolution of the dispute. As discussed above, National Grid's previously filed actions, which involve both federal and state constitutional claims, have been languishing in state court for years. Even National Grid's motion to consolidate the actions has remained pending for more than three years, leaving the parties disputing the same issues in twenty separate actions in three separate state courts. "If there is any substantial doubt as to" the adequacy of parallel state-court litigation for completely and promptly resolving the issues between the parties, it is "a serious abuse of discretion" for a district court to abstain from exercising jurisdiction. Id. Such doubts are present here, and the district court therefore abused its discretion by abstaining from exercising jurisdiction over National Grid's remaining constitutional claims.

In sum, at least five of the six Colorado River factors militate against abstention, and the remaining factor – avoidance of piecemeal litigation – is not nearly as favorable to abstention as the district court concluded. We recognize that "the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." Moses H. Cone, 460 U.S. at 16. However, nothing in the district court's analysis or in the arguments of the parties identifies other relevant factors not addressed above, or suggests a more holistic analysis, that would suffice to tilt the balance toward abstention and against the heavy presumption in favor of exercising jurisdiction. We therefore conclude

35

that the district court abused its discretion in abstaining under Colorado River.

B.  *Wilton* Abstention

In addition to abstaining under Colorado River, the district court found, "alternatively," that abstention was "also warranted under the more lenient standard of review" for declaratory judgment actions set out in Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995) (holding that in declaratory judgment actions, district courts have "greater" discretion to abstain than under Colorado River's "exceptional circumstances" test).  See Niagara Mohawk, 2010 WL 3909864, at *7.  The district court concluded that because "the entire amended complaint seeks various declaratory judgments," abstention was warranted under Wilton "due to the indisputable existence of concurrent identical state court litigation."  Id.

We review a district court's dismissal of a federal declaratory judgment action due to a parallel, pending state-court action "deferentially, for abuse of discretion."  Dow Jones & Co. v. Harrods Ltd., 346 F.3d 357, 359 (2d Cir. 2003).  "Courts have consistently interpreted [the] permissive language [of the Declaratory Judgment Act] as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear."  Id.  Despite the considerable deference we grant district courts under the Wilton abstention standard, we conclude that the district court abused its discretion by dismissing National Grid's remaining constitutional claims.

Under the Wilton test, "[t]o avoid wasteful and duplicative litigation, district courts may often dismiss declaratory judgment actions 'where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same

36

parties.'"  Dittmer, 146 F.3d at 118, quoting Wilton, 515 U.S. at 282 (internal quotation

marks omitted); see also Youell v. Exxon Corp., 74 F.3d 373, 375 (2d Cir. 1996).

Wilton did not define "the outer boundaries" of district courts' discretion to refrain

from hearing declaratory judgment actions; indeed, the Supreme Court specifically left

open the question of whether the rule even applies in "cases raising issues of federal law."

Wilton, 515 U.S. at 290.  The Court held that a district court "acted within its bounds in

staying [an] action for declaratory relief where parallel proceedings, presenting

opportunity for ventilation of the same *state law* issues, were underway in state court."

Id. (emphasis added).  The present case, by contrast, involves federal as well as state

claims, with the former predominating over the latter.  Furthermore, Wilton did not

sanction dismissal of a declaratory judgment action on abstention grounds; instead, the

Court noted that "where the basis for declining to proceed is the pendency of a state

proceeding, a stay will often be the preferable course, because it assures that the federal

action can proceed without risk of a time bar if the state case, for any reason, fails to

resolve the matter in controversy."  Id. at 288 n.2.  But here, rather than staying the

federal proceedings, the district court dismissed the action.

Although the Wilton test grants district courts broad discretion, that discretion is

not unfettered.  Our Court and other circuit courts have developed a set of factors "to

guide the exercise of discretion in Declaratory Judgment Act cases."  Dow Jones, 346

F.3d at 359.  Our test "asks (1) whether the judgment will serve a useful purpose in

clarifying or settling the legal issues involved" and "(2) whether a judgment would

finalize the controversy and offer relief from uncertainty."  Id.  Other circuits have added

additional factors: (3) "whether the proposed remedy is being used merely for 'procedural

fencing' or a 'race to res judicata,'" (4) "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court," and (5) "whether there is a better or more effective remedy." Id. at 359-60.

Here, there is no indication that the district court applied these factors before deciding to abstain. Compare Niagara Mohawk, 2010 WL 3909864, at *7, with Dow Jones, 346 F.3d at 360 ("The district court cited the five tests . . . then performed a detailed analysis of the application of all the factors to the instant case."). Applying the factors to the present case, we conclude that abstention was not justified under Wilton. A judgment by the district court clearly would serve a useful purpose here, settle the legal issues involved, finalize the controversy, and offer National Grid and the District relief from uncertainty. Nor is there any evidence that National Grid turned to the federal courts for any improper purposes, that a declaratory judgment "would increase friction" between the federal courts and New York state courts, or that there is "a better or more effective remedy" than a decision by the federal district court. See Dow Jones, 346 F.3d at 359-60.

Furthermore, one of the two claims that the district court dismissed on abstention grounds – an equal protection claim – is governed solely by federal law. The remaining claim – that the District's assessments constitute impermissible takings under the due process clauses of the United States and New York State constitutions – includes a state issue that is substantially indistinguishable from the federal question. In short, this is not the type of case for which Wilton abstention was designed: "where another suit is pending in a state court presenting the same issues, *not governed by federal law*, between the same

38

parties," and "the questions in controversy . . . can better be settled in the proceeding pending in the state court." Wilton, 515 U.S. at 282 (internal quotation marks omitted) (emphasis added). Indeed, cases like this one that involve questions of federal law are "fundamentally distinct from Wilton because federal law supplies a rule of decision," whereas Wilton "involved state law only." See Youell, 74 F.3d at 376 (internal quotation marks and ellipsis omitted).

Finally, "Wilton does not apply" where, as here, a plaintiff does not "seek purely declaratory relief," but also, for example, disputes a payment made to the defendant and seeks "damages caused by the [defendant's] conduct." Vill. of Westfield, 170 F.3d at 124 n.5. See Am. Compl. 23.

We therefore hold that the district court abused its discretion in abstaining from deciding, and dismissing, under both Colorado River and Wilton, National Grid's remaining constitutional claims. We remand those claims for resolution, and express no view on their merits.[7]

---

[7] The Wilton abstention question of whether the district court should have exercised jurisdiction over National Grid's constitutional claims is distinct from the remedial question of whether the district court should grant declaratory relief on those claims under the Declaratory Judgment Act ("DJA"). District courts enjoy broad discretion under the DJA to grant or deny declaratory relief. See 28 U.S.C. § 2201(a) (the court "may declare the rights and other legal relations of any interested parties such declaration, whether or not further relief is or could be sought"). The DJA "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant. The propriety of issuing a declaratory judgment may depend upon equitable considerations, and is also informed by the teachings and experience concerning the functions and extent of federal judicial power." Green v. Mansour, 474 U.S. 64, 72 (1985) (internal quotation marks and citations omitted). Equitable discretion as to whether a declaratory remedy should be granted is best exercised after a fuller record has been developed, and presents different issues than the decision whether to abstain from exercising jurisdiction at all. We express no view on whether declaratory relief under the DJA on National Grid's equal protection and takings claims will ultimately prove appropriate. In any event, we note that National Grid seeks not

39

## III. Dismissal of the DEC

National Grid's original complaint contained only a handful of allegations referencing the DEC. National Grid alleged only that the DEC is "required to review and approve all apportionments recommended by the District for the collection of its budgets, review and approve all proposed regulations by the District and receive and review annual reports from the District regarding its operations," Compl. ¶ 13; that the District and the DEC, by signing the Offer of Settlement, "obligated themselves to complete" a reapportionment of the 1925 assessment that the District still uses for its present apportionment methodology, id. ¶¶ 56-63; and that the District and the DEC "failed to make a good faith effort to effectuate" a reapportionment, id. ¶ 75; see also id. ¶¶ 71, 73. None of the five causes of action in the complaint mentioned the DEC or sought relief specifically against it.

The DEC moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss National Grid's claims against it. The district court granted the motion, concluding that (1) "[a]lthough it is undisputed that DEC has the authority to approve any plan for reapportionment submitted by the District, none has yet been submitted"; (2) National Grid had "cite[d] no authority suggesting that DEC has the power to order or force a reapportionment"; and (3) the complaint neither sought "reapportionment as an avenue of relief" nor made any "legal or factual connection between the alleged actions or inactions

only a declaratory judgment but also, inter alia, a damages award of $5 million and "such other relief as the [district court] deems appropriate," including fees and costs. See Am. Compl. ¶ 1. These demands for non-declaratory relief also counsel against Wilton abstention. See Vill. of Westfield, 170 F.3d at 116 n.5.

of DEC and the causes of actions and/or relief as set forth in the complaint." Niagara Mohawk, 2009 WL 3030146, at *7.

National Grid then filed an amended complaint, but National Grid and the DEC, pursuant to a stipulation, agreed that the district court's memorandum decision and order would be deemed to apply to the amended complaint, and that the DEC would not need to file an answer or involve itself in the continuing district court proceedings. However, National Grid reserved its right to appeal the district's court's decision dismissing the DEC from this action.

National Grid's appellate brief to this Court mentions the dismissal of the DEC only twice. In its list of "The Issues Presented for Review," National Grid includes: "Whether the [district court] properly granted dismissal of claims against Defendant Department of Environmental Conservation ('DEC')?" Appellant's Br. 3. The only other mention of the issue, however, is in the brief's "Statement of Facts" section, in a footnote to a sentence describing the DEC as "an agency of the State of New York charged with supervision of" the District:

> Pursuant to ECL Article 15, Title 21, and amongst other things, DEC is required to review and approve all apportionments recommended by [the District] for the collection of its budgets; review and approve all proposed regulations by [the District]; and receive and review annual reports from HRBRRD regarding its operations. Such review is required triennially. The DEC has failed to comply with its statutory duties, which failure has resulted in separate claims of constitutional violations against the DEC. These claims were improperly dismissed. National Grid has appealed that dismissal.

Id. at 12 n.2. No separate heading in the argument section of the brief addresses this argument, and nowhere within any of the sections addressing other arguments are any

41

rationales or authority for reversing the district court's dismissal of the DEC set out.

These cursory, conclusory references do not present for appellate review the question of whether the district court properly dismissed the DEC from this action. See Fed. R. App. P. 28(a)(9)(A) (an appellant's argument must contain, inter alia, the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). "Merely mentioning" or "[s]imply stating" an issue in an appellate brief is insufficient to preserve it for our review: an appellant must "advance an argument," and we generally will decline to consider issues that are "not sufficiently argued." Gross v. Rell, 585 F.3d 72, 95 (2d Cir. 2009) (internal quotation marks, brackets, and citation omitted). "It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." Tolbert v. Queens Coll., 242 F.3d 58, 75 (2d Cir. 2000) (internal quotation marks and citations omitted). This rule has particular force where an appellant makes an argument only in a footnote. See id. ("A contention is not sufficiently presented for appeal if it is conclusorily asserted only in a footnote."); United States v. Restrepo, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review.").

Because National Grid has failed to advance any non-perfunctory argument regarding the district's court's dismissal of the DEC from this action, we deem the issue waived and affirm the district court's judgment.[8]

---

[8] Even were we to deem this issue preserved, we would affirm the dismissal of the DEC. We agree with the district court that the original complaint failed to state a cognizable claim against the DEC and that the amended complaint did not cure those deficiencies.

## CONCLUSION

For the foregoing reasons, we conclude that the District's assessment powers over the Subject Parcels are not federally preempted, and thus affirm the district court's dismissal of National Grid's Federal Power Act-based claims. We also affirm the district court's dismissal of the DEC from this action. However, because we find that the district court abused its discretion in abstaining from exercising jurisdiction over National Grid's remaining constitutional claims, we vacate that portion of the judgment and remand those claims to the district court for disposition.